**FOURTH DIVISION**
**DILLARD, C. J.,**
**RAY, P. J., and SELF, J.**

**NOTICE: Motions for reconsideration must be**
***physically received*** **in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**November 3, 2017**

# In the Court of Appeals of Georgia

A17A1847. ABERCROMBIE v. THE STATE.

DILLARD, Chief Judge.

David Abercrombie appeals from the trial court's denial of his motion to suppress evidence, contending that the trial court should have granted the motion because (1) the officer who stopped him lacked reasonable, articulable suspicion to do so and (2) the officer did not make a reasonable mistake of law. For the reasons set forth *infra*, we reverse.

Viewed in the light most favorable to the trial court's ruling,[1] the evidence shows that on May 22, 2015, a law-enforcement officer passed Abercrombie's single-cab pickup truck while driving in the opposite direction and noticed that the vehicle

---

[1] *See, e.g.*, *Christian v. State*, 329 Ga. App. 244, 245 (1) (764 SE2d 573) (2014).

lacked an interior rearview mirror. The officer then initiated a traffic stop and, upon making contact with Abercrombie at the vehicle, detected a strong odor of an alcoholic beverage. During the investigation that ensued (which included the administration of field-sobriety tests),[2] one of two officers saw in plain view inside Abercrombie's truck a pipe used to smoke marijuana and, upon a brief search, suspected marijuana. Thereafter, Abercrombie was arrested for possession of marijuana and drug-related objects. Then, during a more thorough contraband search of Abercrombie's vehicle, the officers discovered a methamphetamine pipe. The officers also found methamphetamine outside of, but close to, Abercrombie's vehicle.

Abercrombie was subsequently indicted for possession of methamphetamine and drug-related objects. He moved to suppress the drug evidence, arguing that the stop of his vehicle was unconstitutional. The State argued at the suppression hearing that the stop was permissible because driving a vehicle that lacks an interior rearview mirror constitutes an equipment violation under OCGA § 40-8-7 and OCGA § 40-8-72. And indeed, the officer who stopped Abercrombie's vehicle testified that this was why he initiated the stop.

---

[2] The officer testified that he was unable to prove that Abercrombie was driving under the influence to the extent that he was less-safe to do so.

2

In particular, the officer testified that his understanding of the law was that "anything the vehicle comes equipped with has to be in good working condition if it came from the manufacturer." And although he did not testify to the make, model, or year of Abercrombie's single-cab truck, the officer opined that "most, even the older cars, always come with a rearview mirror." The officer also testified that "[y]our rearview mirror is the only one that reflects distinctly for the actual rear of your vehicle," and that side mirrors are only appropriate for box trucks and vehicles with cages (*i.e.*, vehicles with an obstructed view). Then he immediately reiterated his understanding that "if it's a vehicle that comes equipped with a rearview mirror, it needs to be in good working condition." The officer also explained that relying upon side mirrors for a rear view makes it a "bit more difficult to notice what's behind you," and therefore, "you always need to have a rearview mirror . . . so you can see directly behind your vehicle."

The officer testified further that he frequently enforces equipment violations under OCGA § 40-8-7 because "anything your vehicle comes equipped with . . . we just want to bring it to their attention . . . ." He then later clarified, when confronted with the text of the statute, that his understanding of OCGA § 40-8-7 was that it required "if your vehicle is equipped [sic] then everything has to be in good working

3

condition," such that "[i]f the vehicle is equipped with a rearview mirror, then it needs to be equipped with it in good working condition." Thus, the officer testified that because he believed that Abercrombie's vehicle had originally been equipped with an interior rearview mirror but did not have one at the time the officer observed the vehicle on the road, Abercrombie was committing an equipment violation.

Upon further questioning regarding OCGA § 40-8-72, the officer admitted that Abercrombie's truck had two side mirrors, and he testified that he understood the law to require that a vehicle have a mirror that reflects 200 feet to the rear and that it did not specify a type of mirror. But he then opined that "if you look up the definition of side mirrors, it's for your blind spots, things of that nature" and that the "rearview mirror is specifically to direct the reflection of rear [sic] of your vehicle." And, once again, the officer testified that "they're all equipped with it" and that the only vehicles he had observed *without* an interior rearview mirror were box trucks or "something that wouldn't even make sense if you had a rearview mirror because you are not going to see to the rearview anyway[.]" He concluded, "that's where I think that Code Section puts in there that your two side mirrors would suffice if your vehicle is like a commercial vehicle, I think."

After hearing the officer's testimony, as well as argument from Abercrombie and the State, the trial court agreed with the State's argument regarding an equipment violation but additionally found that *even if* the lack of an interior rearview mirror was not an equipment violation under the law, the officer had acted in good faith when he initiated the stop. Accordingly, the trial court denied the motion to suppress but also issued a certificate of immediate review. We then granted Abercrombie's application for an interlocutory appeal.

When we consider a trial court's denial of a motion to suppress, we construe the evidence in favor of the court's ruling, "and we review de novo the trial court's application of the law to undisputed facts."[3] Additionally, the State has the burden of proving the lawfulness of a search and seizure at the motion-to-suppress hearing.[4]

---

[3] *Christian*, 329 Ga. App. at 245 (1) (punctuation omitted); *see also Jupiter v. State*, 308 Ga. App. 386, 387 (1) (707 SE2d 592) (2011) ("[W]e review a trial court's ruling on a motion to suppress evidence using the 'any evidence' standard, which means that we sustain all of the trial court's findings of fact that are supported by any evidence. Thus, we construe all evidence presented in favor of the trial court's findings and judgment, accepting the trial court's decision unless it is clearly erroneous." (punctuation & footnotes omitted)).

[4] *See, e.g., Jupiter*, 308 Ga. App. at 387 (1); *State v. Fisher*, 293 Ga. App. 228, 229 (666 SE2d 594) (2008).

With these guiding principles in mind, we turn now to Abercrombie's enumerations of error.

1. Abercrombie argues that the officer who stopped him lacked reasonable, articulable suspicion to initiate a stop of his vehicle. Specifically, he contends that his truck's lack of an interior rearview mirror did not constitute a violation of OCGA § 40-8-7 and OCGA § 40-8-72 and, as a result, could not have given the officer the requisite reasonable, articulable suspicion to justify a stop. We agree.

In order to initiate a traffic stop, a law-enforcement officer must have "specific and articulable facts that provide a reasonable suspicion that the individual being stopped is engaged in criminal activity."[5] Here, as previously detailed, the officer who stopped Abercrombie testified that he initiated the stop due to a suspected violation of OCGA § 40-8-7 and OCGA § 40-8-72 when he noticed that Abercrombie's single-cab pickup truck lacked an interior rearview mirror. Thus, we must determine whether the absence of an interior rearview mirror constitutes a violation of the relevant Code sections.

---

[5] *Loveless v. State*, 337 Ga. App. 894, 896 (1) (789 SE2d 244) (2016) (punctuation omitted); *accord Valentine v. State*, 323 Ga. App. 761, 763 (748 SE2d 122) (2013).

In this regard, the fundamental rules of statutory construction require us to "construe the statute according to its terms, to give words their plain and ordinary meaning, and to avoid a construction that makes some language mere surplusage."[6] Put another way, when we consider the meaning of a statute, we must (1) "presume that the General Assembly meant what it said and said what it meant,"[7] and (2) "read the statutory text in its most natural and reasonable way, as an ordinary speaker of the English language would."[8] As our Supreme Court has recently explained,

[i]n our search for the meaning of a particular statutory provision, we look not only to the words of that provision, but we consider its legal

---

[6] *State v. Mussman*, 289 Ga. 586, 588 (1) (713 SE2d 822) (2011) (punctuation omitted); *see also Martinez v. State*, 325 Ga. App. 267, 273 (2) (750 SE2d 504) (2013) ("[A]s with any question of statutory interpretation, we necessarily begin our analysis with familiar and binding canons of construction. Indeed, in considering the meaning of a statute, our charge as an appellate court is to 'presume that the General Assembly meant what it said and said what it meant.' And toward that end, we must afford the statutory text its plain and ordinary meaning, consider the text contextually, and read the text 'in its most natural and reasonable way, as an ordinary speaker of the English language would.' In sum, where the language of a statute is plain and susceptible of only one natural and reasonable construction, 'courts must construe the statute accordingly.'" (citations and punctuation omitted)).

[7] *Fed. Dep. Ins. Corp. v. Loudermilk*, 295 Ga. 579, 588 (2) (761 SE2d 332) (2014) (punctuation omitted); *see also Deal v. Coleman*, 294 Ga. 170, 172 (1) (a) (751 SE2d 337) (2013).

[8] *Loudermilk*, 295 Ga. at 588 (2) (punctuation omitted); *see also Deal*, 294 Ga. at 172 (1) (a).

context as well. After all, context is a primary determinant of meaning. For context, we may look to the other provisions of the same statute, the structure and history of the whole statute, and the other law—constitutional, statutory, and common law alike—that forms the legal background of the statutory provision in question.[9]

Here, the relevant statutes are OCGA § 40-8-7 and OCGA § 40-8-72. OCGA § 40-8-7 provides, in pertinent part, that

[n]o person shall drive or move on any highway any motor vehicle . . . unless the equipment upon any and every such vehicle is in good working order and adjustment as required in this chapter and the vehicle is in such safe mechanical condition as not to endanger the driver or other occupant or any person upon the highway.[10]

That Code section also specifies that it is a misdemeanor to drive "on any street or highway any vehicle . . . [w]hich does not contain those parts or is not at all times equipped with such lights and other equipment in proper condition and adjustment

---

[9] *Loudermilk*, 295 Ga. at 588 (2) (punctuation omitted); *accord May v. State*, 295 Ga. 388, 391-92 (761 SE2d 38) (2014).

[10] OCGA § 40-8-7 (a).

as required in this chapter[.]"[11] As far as equipment with mirrors is concerned, OCGA § 40-8-72 provides:

(a) Except as provided in subsection (b) of this Code section, every motor vehicle which is so constructed or loaded as to obstruct the driver's view to the rear thereof from the driver's position shall be equipped with a mirror so located as to reflect to the driver a view of the highway for a distance of at least 200 feet to the rear of such vehicle.

(b) Every commercial motor vehicle shall be equipped with two rear-vision mirrors meeting the requirements of the federal motor vehicle safety standards . . . in effect at the time of manufacture, one at each side, firmly attached to the outside of the motor vehicle, and so located as to reflect to the driver a view of the highway to the rear, along both sides of the vehicle; provided, however, that only one outside mirror shall be required, which shall be on the driver's side, on a commercial motor vehicle which is so constructed that the driver has a view to the rear by means of an interior mirror.

The trial court summarily concluded in its order that the officer's stop of Abercrombie's vehicle "was valid." But at the motion-to-suppress hearing, the court explained its belief that the statutes at issue were "vague enough that the officer's interpretation is correct." We disagree.

---

[11] OCGA § 40-8-7 (b) (2).

First, as to OCGA § 40-8-7, although the officer repeatedly testified that his understanding was that this Code section required vehicles to be equipped with anything original to manufacture, it instead requires that vehicle equipment be "in good working order and adjustment *as required in this chapter*"[12] and that a vehicle "contain those parts or . . . at all times [be] equipped with such lights and other equipment in proper condition and adjustment *as required in this chapter*."[13] Thus, OCGA § 40-8-7 does not require vehicles to contain all original equipment from the time of manufacture but, instead, only such equipment in such proper condition and adjustment as explicitly required by the remaining provisions of Chapter 40.[14]

Next, looking to the plain language of OCGA § 40-8-72 (a), it is clear that there is no specific requirement that a non-commercial vehicle contain an *interior*

---

[12] OCGA § 40-8-7 (a) (emphasis supplied).

[13] OCGA § 40-8-7 (b) (2) (emphasis supplied).

[14] *Cf.* OCGA § 40-8-25 (b) ("If a motor vehicle is manufactured with two brake lights, both must be operational."); OCGA § 40-8-28 (c) ("If a vehicle is manufactured with two lights meeting the requirements of subsection (b) of this Code section, both such lights shall be maintained in good working order."). Abercrombie argues in a separate enumeration of error that the State failed to meet its burden of proof at the suppression hearing by neglecting to show that his truck was originally equipped by the manufacturer with an interior rearview mirror. But given our interpretation of OCGA § 40-8-7, we need not address this contention.

10

rearview mirror. Instead, OCGA § 40-8-72 (a), which is subject only to an exception in subsection (b) that applies to *commercial* motor vehicles, requires that vehicles be "equipped with a mirror so located as to reflect to the driver a view of the highway for a distance of at least 200 feet to the rear of such vehicle" when the vehicle is "so constructed or loaded as to obstruct the driver's view to the rear thereof from the driver's position." That subsection (a) does not specifically require the use of an *interior* mirror is bolstered by the fact that subsection (b), applicable to commercial motor vehicles, *does* specify the use of an interior mirror under certain circumstances.[15]

We have previously upheld the *grant* of a motion to suppress when a trial court determined that "no law absolutely requires that a car be equipped with *side view* mirrors,"[16] citing the very statute at issue here—OCGA § 40-8-72 (a)—and

---

[15] OCGA § 40-8-72 (b) ("Every commercial motor vehicle shall be equipped with two rear-vision mirrors meeting the requirements of the federal motor vehicle safety standards . . . in effect at the time of manufacture, one at each side, firmly attached to the outside of the motor vehicle, and so located as to reflect to the driver a view of the highway to the rear, along both sides of the vehicle; provided, however, that only one outside mirror shall be required, which shall be on the driver's side, on a commercial motor vehicle which is so constructed that the driver has a view to the rear by means of an *interior mirror*." (emphasis supplied)).

[16] *State v. Reid*, 313 Ga. App. 633, 634 (722 SE2d 364) (2012).

11

emphasizing its requirement that a vehicle be equipped with "a mirror."[17] And in

*United States v. Chanthasouxat*,[18] the United States Court of Appeals for the Eleventh

Circuit concluded that similarly worded provisions in the Birmingham, Alabama,

municipal code and the Code of Alabama did not require that a vehicle be equipped

with an interior rearview mirror.[19] Indeed, the Eleventh Circuit reasoned that "the

---

[17] *Id.* at 634 n.3; *see also Springer v. State*, 125 So3d 271, 274 (Fla. App. 2013) ("Because section 316.294 [of the Florida Statutes] requires that a vehicle have 'a' mirror capable of viewing 200 feet behind the vehicle, the absence of a single mirror on the exterior of the car neither violates the statute nor renders the vehicle unsafe by an objectively reasonable standard, without proof there was no other sideview or rearview mirror on the vehicle. We therefore find the stop to have been illegal. The motion to suppress should have been granted.").

[18] 342 F3d 1271 (11th Cir. 2003).

[19] *Id.* at 1278 (IV) (A) (iii) (b) ("Under the plain language of [the city] ordinance, drivers who can look backward from the driver's position to see out a back window would not be required to have any rear-view mirror. But even if a rear-view mirror is required because the driver cannot 'obtain a view of the street to the rear by looking backward from the driver's position,' the ordinance says nothing about requiring that the mirror be on the *inside* of the vehicle. . . . The [state] statute requires a rear-view mirror, but specifies only that the mirror be 'so located as to reflect to the driver a view of the highway for a distance of at least 200 feet to the rear of such motor vehicle.' Again, there is no requirement that the mirror be *inside* the vehicle." (citation omitted)); *see also* Ala. Code § 32-5-214 ("Every motor vehicle, operated singly or when towing any other vehicle, shall be equipped with a mirror so located as to reflect to the driver a view of the highway for a distance of at least 200 feet to the rear of such motor vehicle."); former Birmingham City Code § 10-11-5 (requiring that a driver be able to "obtain a view of the street to the rear by looking backward from the driver's position" or have "a mirror so located as to reflect to the

12

requirement that the driver be able to see 200 feet to the rear of his vehicle creates a question of fact, but [because] the statute does not assume that this requirement can only be met by an inside rear-view mirror, there is no reason for [an officer] to make such an assumption."[20] Likewise, because, by its plain language, OCGA § 40-8-72 (a) does not require that a motor vehicle be equipped with an interior rearview mirror under these circumstances, Abercrombie's lack of an interior rearview mirror did not violate that statute *or* OCGA § 40-8-7's requirement that vehicles be equipped as provided for in Chapter 40 of the Code.[21] Nevertheless, we must still consider the trial court's alternative ground for denying the motion to suppress—that even if the lack

---

driver a view of the streets for a distance of at least 200 feet of the rear of the vehicle").

[20] *Chanthasouxat*, 342 F3d at 1278 (IV) (A) (iii) (b) (footnote omitted).

[21] *See Leslie v. State*, 108 So3d 722, 723 (Fla. App. 2013) (per curiam) ("Florida law requires a vehicle to have 'a mirror so located as to reflect to the driver a view of the highway for a distance of at least 200 feet to the rear of the motor vehicle.' Th[e] statute does not require a center rearview mirror if one or more side mirrors meet its requirement, so here, the officer's belief to the contrary was a mistake of law." (citation omitted)). *Cf. People v. Sup. Ct. of Humboldt Cnty.*, 266 CalApp2d 685, 687 & n.1 (Cal. App. 1968) (holding that officers properly stopped vehicle that was observed with "a spare tire . . . blocking the rear window and no exterior rearview mirrors . . . mounted on the sides of the car" because state law required that "[e]very motor vehicle . . . be equipped with a mirror so located as to reflect to the driver a view of the highway for a distance of at least 200 feet to the rear of such vehicle").

13

of an interior rearview mirror did not violate the relevant statutes, the officer initiated the stop in good faith based upon a reasonable belief that those statutes were violated.

2. Abercrombie contends that the trial court erred in denying the motion to suppress on the alternative ground that the officer made the traffic stop in good faith, arguing that the "good-faith exception" does not apply under these circumstances because the officer's interpretation of OCGA § 40-8-7 and OCGA § 40-8-72 was unreasonable. Although Abercrombie's argument appears to conflate reasonable mistakes of law that can give rise to reasonable articulable suspicion (and do not violate the Fourth Amendment) with the "good-faith exception" (which can apply notwithstanding a Fourth Amendment violation), we agree that the trial court's alternative ground for denial of the motion to suppress was erroneous.

(a) *Reasonable, articulable suspicion from reasonable mistakes of law.* In *Chanthasouxat*, discussed *supra*, the Eleventh Circuit held that although "an officer's reasonable mistake of fact may provide the objective grounds for reasonable suspicion or probable cause required to justify a traffic stop, . . . an officer's mistake of law may not."[22] The Eleventh Circuit explained that it found the relevant statute and ordinance unambiguous but that the stopping officer made a reasonable mistake

---

[22] 342 F3d at 1276 (IV) (A) (iii).

14

of law due to his training on the subject, a city magistrate's interpretation of the law as explained to the officer, and the officer's history of having written more than 100 tickets for the lack of an interior rearview mirror.[23] Nevertheless, the Eleventh Circuit followed the Fifth and Ninth Circuits in concluding that "a mistake of law, *no matter how reasonable or understandable*, can [never] provide the objectively reasonable grounds for reasonable suspicion or probable cause."[24]

Since *Chanthasouxat*, the Supreme Court of the United States has reached the opposite conclusion. In *Heien v. North Carolina*,[25] authored by Chief Justice John Roberts, the Court addressed situations in which an officer initiates a traffic stop based upon a mistake of law and determined that *objectively reasonable* mistakes of law *can* give rise to the reasonable suspicion necessary to uphold a search and seizure under the Fourth Amendment to the United States Constitution.[26]

---

[23] *Id.* at 1279 (IV) (A) (iii) (b).

[24] *Id.* (emphasis supplied).

[25] __ U.S. __ (135 SCt 530, 190 LE2d 475) (2014).

[26] *Id.* at __ (135 SCt at 530); *see also* US Const. Amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.").

In *Heien*, a law-enforcement officer initiated a traffic stop after noticing that one of a vehicle's two brake lights was faulty, but the North Carolina Court of Appeals reversed the denial of a motion to suppress after determining that state law only required *one* working brake light, not two.[27] The Supreme Court of North Carolina then reversed this decision, holding that even if the law did not require two operable brake lights, the stop was valid because the initiating officer had a reasonable belief that only one working brake light was a violation of law.[28] After examining the statute at issue, the Supreme Court of the United States affirmed the denial of the motion to suppress, determining that the stopping officer made a reasonable mistake of law and, thus, had reasonable suspicion to justify the stop.[29]

In reaching this conclusion, the Supreme Court of the United States distinguished cases in which an officer initiates a stop based upon a reasonable mistake of law and those in which the Fourth Amendment has been violated but, nevertheless, the exclusionary rule does not apply due to the so-called "good faith"

---

[27] *Heien*, __ U.S. at __ (I) (135 SCt at 534-35 (I)).

[28] *Id.* at __ (I) (135 SCt at 535 (I)).

[29] *Id.* at __ (III) (135 SCt at 540 (III)).

16

exception.[30] The Court explained that it had, in a number of decisions, "looked to the reasonableness of an officer's legal error in the course of considering the appropriate remedy for a constitutional violation, instead of whether there was a violation at all."[31] But in those cases, the Court had already "found or assumed a Fourth Amendment violation" and emphasized that an officer's "mistaken view that the conduct at issue did *not* give rise to such a violation—no matter how reasonable—could not change that ultimate conclusion."[32] Thus, in those cases, consideration of "reasonableness of an officer's mistake was . . . limited to the separate matter of remedy."[33]

In contrast, in *Heien*, "the mistake of law relate[d] to the antecedent question of whether it was reasonable for an officer to suspect that the defendant's conduct was illegal."[34] And there is no Fourth Amendment violation in the first place if the

---

[30] *See id.* at __ (II) (135 SCt at 538-39 (II)).

[31] *Id.* at __ (II) (135 SCt at 539 (II)).

[32] *Id.*

[33] *Id.*

[34] *Id.*

17

mistake *is* reasonable.[35] The Court explained that its holding would not discourage officers from "learning the law" because the Fourth Amendment "tolerates only *reasonable* mistakes, and those mistakes—whether of fact or of law—must be *objectively* reasonable."[36] In this regard, the Court was clear: "[w]e do not examine the subjective understanding of the particular officer involved."[37]

In a concurrence, Justice Elena Kagan gave further direction for making this assessment.[38] To be an *objectively reasonable* mistake of law, because the officer's subjective understanding is irrelevant, it is no defense that an officer was unaware of

---

[35] *Id.*

[36] *Id.*

[37] *Id.*; *see also United States v. Cunningham*, 630 FedAppx 873, 876-77 (II) (10th Cir. 2015) ("*Heien* provided ground rules. An officer's subjective understanding of the law is irrelevant; the mistake of law must be objectively reasonable. . . . Moreover, an officer's mistake of law may be reasonable if the law is ambiguous (reasonable minds could differ on the interpretation) and it has never been previously construed by the relevant courts.").

[38] Contrary to the majority's repeated responses to the dissent in *Heien*, there is no such criticism or reference to Justice Kagan's concurrence. We, like other courts, find the reasoning given in the concurrence to be persuasive and to align with the analysis applied in the majority opinion. *See, e.g.*, *United States v. Diaz*, 854 F3d 197, 204 (II) (2nd Cir. 2017) (considering guidance provided by Justice Kagan's concurrence); *United States v. Lawrence*, 675 FedAppx 1, 3 (II) (1st Cir. 2017) (same); *Cunningham*, 630 FedAppx at 877 (II) (same).

or untrained in the law or that the officer relied upon improper training or departmental direction.[39] Instead, courts face a "straightforward question of statutory construction" when deciding whether an officer made a reasonable mistake of law.[40] And if the law in question is "genuinely ambiguous, such that overturning the officer's judgment requires hard interpretive work, then the officer has made a reasonable mistake."[41]

---

[39] *Heien*, __ U.S. at __ (135 SCt at 541) (Kagan, J., concurring); *see also Terry v. Ohio*, 392 U.S. 1, 21-22 (III) (88 SCt 1868, 20 LE2d 889) (1968) ("The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate? Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction. And simple good faith on the part of the arresting officer is not enough. If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be secure in their persons, houses, papers and effects, only in the discretion of the police." (citations & footnotes omitted)).

[40] *Heien*, __ U.S. at __ (135 SCt at 541) (Kagan, J., concurring).

[41] *Id.*

Suffice it to say, *Heien* provides greater clarity for our own precedent.[42] Indeed, we have previously explained that if an officer, acting in good faith, "believes that an unlawful act has been committed, his actions are not rendered improper by a later legal determination that the defendant's actions were not a crime according to a technical legal definition or distinction determined to exist in the penal statute."[43] Instead, when "an officer's honest belief that a traffic violation has actually occurred proves to be incorrect, the officer's mistaken-but-honest belief may nevertheless demonstrate the existence of at least an articulable suspicion and reasonable grounds for the stop."[44] And, as we have explained, it is not the function of law-enforcement

---

[42] *Cf. Sevilla-Carcamo v. State*, 335 Ga. App. 788, 792 (2) n.12 (783 SE2d 150) (2016) (declining to address appellant's second enumeration of error, which was that "trial court erred in finding . . . that the officer had a good-faith basis to stop her vehicle notwithstanding any mistake of law," but citing to *Heien v. North Carolina* for proposition that "reasonable suspicion can rest on a mistaken understanding of the scope of a legal prohibition").

[43] *Toole v. State*, 340 Ga. App. 633, 634 (798 SE2d 288) (2017) (punctuation omitted); *accord State v. Cartwright*, 329 Ga. App. 154, 157 (764 SE2d 175) (2014); *Valentine v. State*, 323 Ga. App. 761, 764 (1) (748 SE2d 122) (2013); *Dixon v. State*, 271 Ga. App. 199, 201-02 (609 SE2d 148) (2005); *State v. Hammang*, 249 Ga. App. 811, 811 (549 SE2d 440) (2001); *State v. Whitfield*, 219 Ga. App. 5, 7 (463 SE2d 728) (1995); *State v. Webb*, 193 Ga. App. 2, 3 (1) (386 SE2d 891) (1989); *McConnell v. State*, 188 Ga. App. 653, 654 (1) (374 SE2d 111) (1988) (physical precedent only).

[44] *Camacho v. State*, 292 Ga. App. 120, 122 (1) (663 SE2d 364) (2008) (punctuation omitted); *accord Worsham v. State*, 251 Ga. App. 774, 775 (554 SE2d

officers to "determine on the spot such matters as the legal niceties in the definition of a certain crime, for these are matters for the courts."[45] To the contrary, the question that must be decided is "whether the officer's motives and actions at the time and under all the circumstances were reasonable and not arbitrary or harassing."[46] In light of *Heien*, courts must assess whether an officer's "mistaken-but-honest" belief as to the requirements of a law was *objectively* reasonable in terms of statutory construction.[47]

---

805) (2001); *Webb*, 193 Ga. App. at 4 (1).

[45] *Valentine*, 323 Ga. App. at 764 (1) (punctuation omitted); *accord Dixon*, 271 Ga. App. at 201-02; *State v. Stafford*, 288 Ga. App. 309, 313 (1) (653 SE2d 750) (2007); *Webb*, 193 Ga. App. at 3 (1); *McConnell*, 188 Ga. App. at 654 (1) (physical precedent only).

[46] *Valentine*, 323 Ga. App. at 764 (1) (punctuation omitted); *accord Camacho*, 292 Ga. App. at 122 (1); *Dixon*, 271 Ga. App. at 201-02; *Hammang*, 249 Ga. App. at 811; *McConnell*, 188 Ga. App. at 654 (1) (physical precedent only).

[47] In this regard, it is questionable whether *State v. Cartwright*, 329 Ga. App. 154 (764 SE2d 175) (2014), which was decided before *Heien*, continues to maintain any precedential utility. There, we reversed the grant of a motion to suppress when, notwithstanding the fact that the plain language of the law in question required two working brake lights, *see* OCGA § 40-8-25 (b) ("If a motor vehicle is manufactured with two brake lights, both must be operational."), an officer stopped a vehicle because, although it had two side brake lights that were operational, a center light in the rear window was not operational. *Cartwright*, 329 Ga. App. at 155-56.

Here, although the trial court concluded that the statutes at issue were "vague enough that the officer's interpretation [was] correct," we determined with relative ease that the plain language of the statutes is clear and susceptible of only one reasonable interpretation. It is, then, of no consequence that the officer's belief regarding the statute's requirements stemmed from his personal experience and history of writing citations for equipment infractions.[48] Indeed, unlike the statute at issue in *Heien*, there is but one reasonable interpretation of the statutes in this case: OCGA § 40-8-7 specifies that vehicles be equipped as required by other provisions in Chapter 40, and OCGA § 40-8-72 does not require the use of an interior rearview mirror under the circumstances the officer observed (*i.e.*, a single-cab, non-commercial vehicle with two side mirrors, and no testimony regarding an obstructed view).[49] Accordingly, the officer's mistake of law was not objectively reasonable and

---

[48] *See Heien*, __ U.S. at __ (II) (135 SCt at 539 (II)) (Roberts, C.J., majority) ("We do not examine the subjective understanding of the particular officer involved."); *id.* at __ (135 SCt at 541) (Kagan, J., concurring) (explaining that an officer's ignorance of the law, lack of training in the law, improper training in the law, or receipt of improper departmental direction are no excuse because courts are not concerned with an officer's subjective understanding).

[49] *See supra* Division 1.

22

thus could not provide the reasonable, articulable suspicion necessary to justify a traffic stop.[50]

(b) *The good-faith exception to the exclusionary rule.* While *Heien* distinguishes, on the one hand, situations in which an objectively reasonable mistake of law gives rise to reasonable articulable suspicion (and thus does not violate the Fourth Amendment) and, on the other hand, cases in which the so-called "good faith" exception applies notwithstanding a Fourth Amendment violation,[51] it does not

---

[50] *See Heien*, __ U.S. at __ (135 SCt at 540 (III)) (Roberts, C.J., majority) (examining the plain language of the statute at issue to conclude that it was ambiguous and, thus, was susceptible to multiple reasonable interpretations); *id.* at __ (135 SCt at 541) (Kagan, J., concurring) (explaining that a court "faces a straightforward question of statutory construction" when deciding whether an officer made a reasonable mistake of law, and that if the law in question is "genuinely ambiguous, such that overturning the officer's judgment requires hard interpretive work, then the officer has made a reasonable mistake"); *see also United States v. McCullough*, 851 F3d 1194, 1201 (III) (C) (11th Cir. 2017) (holding that officer made an objectively reasonable mistake of law when language of statute was unclear and was susceptible of multiple interpretations); *United States v. Scott*, 693 FedAppx 835, 837-38 (11th Cir. 2017) (same). *Cf. Stafford*, 288 Ga. App. at 313 (1) (holding that officer reasonably believed that law had been violated when he stopped vehicle, noting that Court of Appeals had interpreted the relevant law in two conflicting ways, and reiterating that it "is not the officer's function to determine on the spot such matters as the legal niceties in the definition of a certain crime, for these are matters for the courts" (punctuation omitted)).

[51] *See Heien*, __ U.S. at __ (II) (135 SCt at 538-39 (III)) (Roberts, C.J., majority). *Cf. Curry v. State*, 309 Ga. App. 338, 343-44 (711 SE2d 314) (2011) (Blackwell, J., concurring fully and specially) ("The Fourth Amendment secures

23

explicitly indicate whether the good-faith exception to the exclusionary rule can ever apply when an officer initiates a stop based upon a good faith mistake of law that is not objectively reasonable and thus violates the Fourth Amendment. But in *Chanthasouxat*, the Eleventh Circuit followed other federal circuits in declining to extend the good-faith exception to mistakes of law.[52]

In any event, we are not at liberty to conclusively consider this question. Georgia's exclusionary rule is codified by OCGA § 17-5-30,[53] which provides that

---

individuals against unreasonable searches and seizures, and the exclusionary rule secures individuals against the use in judicial proceedings of evidence obtained in violation of the Fourth Amendment. The good faith exception is an exception to the exclusionary rule, not the reasonableness requirement of the Fourth Amendment or its preference for warrants. Because a search is reasonable when officers obtain the consent of a person whom the officers reasonably, but erroneously, believe is authorized to consent to the search, such a search does not violate the Fourth Amendment. The exclusionary rule—and, therefore, an exception to the exclusionary rule—has no application when there is no violation of the Fourth Amendment." (citations omitted)).

[52] 342 F3d at 1280 (IV) (A) (iii) (b).

[53] *See generally Hernandez v. State*, 294 Ga. 903, 904 (757 SE2d 109) (2014) ("Our statutory law provides a procedure by which an accused may move to suppress evidence that was obtained unlawfully. A motion to suppress must 'be in writing and state facts showing that the search and seizure were unlawful.' In the absence of such a motion, the State has no burden to prove the lawfulness of the manner in which evidence was obtained, and the accused fails to preserve any error with respect to the suppression of the evidence." (citations omitted)); *State v. Johnston*, 249 Ga. 413, 413 (291 SE2d 543) (1982) (quoting *Hawkins v. State*, 117 Ga. App. 70, 70 (159 SE2d

24

[a] defendant aggrieved by an unlawful search and seizure may move the court for the return of property, the possession of which is not otherwise unlawful, and to suppress as evidence anything so obtained on the grounds that: (1) [t]he search and seizure without a warrant was illegal; or (2) [t]he search and seizure with a warrant was illegal because the warrant is insufficient on its face, there was not probable cause for the issuance of the warrant, or the warrant was illegally executed.[54]

The Code section further provides that "[i]f the motion is granted the property shall be restored, unless otherwise subject to lawful detention, and it shall not be admissible in evidence against the movant in any trial."[55]

In *Gary v. State*,[56] the Supreme Court of Georgia considered the scope of OCGA § 17-5-30 and examined whether the "good faith" exception to the exclusionary rule as enunciated in *United States v. Leon*[57] was applicable in

---

440) (1967)), for the proposition that, "[b]y its clear terms, [OCGA § 17-5-30] furnishes a procedural device for the protection of constitutional guarantees against unreasonable search and seizure only").

[54] OCGA § 17-5-30 (a) (1)-(2).

[55] OCGA § 17-5-30 (b).

[56] 262 Ga. 573 (422 SE2d 426) (1992).

[57] 468 U.S. 897 (104 SCt 3405, 82 LE2d 677) (1984).

Georgia.[58] In *Leon*, the Supreme Court of the United States recognized that a judicially created exception to the exclusionary rule was permissible because the Fourth Amendment to the United States Constitution does not contain a provision "expressly precluding the use of evidence obtained in violation of its commands, and an examination of its origin and purposes makes clear that the use of fruits of a past unlawful search or seizure works no new Fourth Amendment wrong."[59] But the Court also recognized that the exclusionary rule, when applied too strictly, exacts a social toll, explaining that

> [a]n objectionable collateral consequence of this interference with the criminal justice system's truth-finding function is that some guilty defendants may go free or receive reduced sentences as a result of favorable plea bargains. Particularly when law enforcement officers have acted in objective good faith or their transgressions have been minor, the magnitude of the benefit conferred on such guilty defendants offends basic concepts of the criminal justice system. Indiscriminate

---

[58] *Gary*, 262 Ga. at 573.

[59] 468 U.S. at 906 (II) (A). *See generally Davis v. United States*, 564 U.S. 229, 238 (II) (131 SCt 2419, 180 LE2d 285) (2011) (acknowledging that prior decisions "treated identification of a Fourth Amendment violation as synonymous with application of the exclusionary rule" but that, in time, the Court "came to acknowledge the exclusionary rule for what it undoubtedly is—a 'judicially created remedy' of this Court's own making" (punctuation omitted)).

26

application of the exclusionary rule, therefore, may well generate disrespect for the law and administration of justice.[60]

Still, the Supreme Court of the United States reiterated that it had not "seriously questioned, in the absence of a more efficacious sanction, the continued application of the [exclusionary] rule to suppress evidence from the prosecution's case [when] a Fourth Amendment violation has been *substantial and deliberate.*"[61] Nevertheless, a "balancing approach" had "evolved in various contexts," and this approach "forcefully suggest[ed] that the exclusionary rule be more generally modified to permit the introduction of evidence obtained in the reasonable good-faith belief that a search or seizure was in accord with the Fourth Amendment."[62] And since *Leon*, the

---

[60] *Leon*, 468 U.S. at 907-08 (II) (A); *see id.* at 918-19 (II) (B) ("[E]ven assuming that the [exclusionary] rule effectively deters some police misconduct and provides incentives for the law enforcement profession as a whole to conduct itself in accord with the Fourth Amendment, it cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity."); *see also Betancourt v. State*, 322 Ga. App. 201, 208 (3) (b) (744 SE2d 419) (2013) (relying upon *Davis v. United States*, 564 US 229 (131 SCt 2419, 180 LE2d 285) (2011), to criticize exclusionary rule), *affirmed on other grounds by Hernandez v. State*, 294 Ga. 903 (757 SE2d 109) (2014).

[61] *Leon*, 468 U.S. at 908-09 (II) (B) (emphasis supplied) (punctuation omitted).

[62] *Id.* at 909 (II) (A) (punctuation omitted) (quoting *Illinois v. Gates*, 462 U.S. 213, 255 (II) (A) (103 SCt 2317, 76 LE2d 527) (1983) (White, J., concurring in judgment)); *see also id.* at 911 (II) (B) ("[T]he 'dissipation of the taint' concept that

27

Supreme Court of the United States has expanded the good-faith exception so as to apply it in a number of other situations.[63]

As for Georgia, in 1992, our Supreme Court determined that OCGA § 17-5-30 "preclude[d] adoption of the *Leon* 'good-faith exception' to the exclusionary rule as

---

the Court has applied in deciding whether exclusion is appropriate in a particular case attempts to mark the point at which the detrimental consequences of illegal police action become so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost. Not surprisingly in view of this purpose, an assessment of the flagrancy of the police misconduct constitutes an important step in the calculus." (punctuation and citation omitted) (quoting *Brown v. Illinois*, 422 U.S. 590, 609 (B) (95 SCt 2254, 45 LE2d 416) (1975) (Powell, J., concurring in part))); *id.* at 919 (II) (B) ("[When] the official action was pursued in complete good faith, . . . the deterrence rationale loses much of its force." (punctuation omitted) (quoting *United States v. Petier*, 422 U.S. 531, 539 (95 SCt 2313, 45 LE2d 374) (1975)).

[63] *See Davis*, 564 U.S. at 232, 241 (III) (expanding the good-faith exception to situations in which "police conduct a search in compliance with binding precedent that is later overruled"); *Herring v. United States*, 555 U.S. 135, 137 (129 SCt 695, 172 LE2d 496) (2009) (expanding the good-faith exception to situations in which police employees err in maintaining records in warrant database); *Arizona v. Evans*, 514 U.S. 1, 14 (115 SCt 1185, 131 LE2d 34) (1995) (expanding the good-faith exception to situations in which police reasonably rely upon erroneous information concerning an arrest warrant in a database maintained by judicial employees); *Illinois v. Krull*, 480 U.S. 340, 340, 349-50 (II) (B) (107 SCt 1160, 94 LE2d 364) (1987) (expanding the good-faith exception of *Leon* to situations in which "officers act in objectively reasonable reliance upon a *statute* authorizing warrantless administrative searches, but where the statute is ultimately found to violate the Fourth Amendment"). *See generally Davis*, 564 U.S. at 237-38 (II) (recognizing that Court has applied the "good-faith" exception in a range of cases, citing *Leon*, *Krull*, *Evans*, and *Herring*).

part of the jurisprudence of Georgia."[64] In doing so, the *Gary* Court noted that, in enacting OCGA § 17-5-30, "Georgia has chosen to impose greater requirements upon its law enforcement officers than that required by the U.S. Constitution, as interpreted by the U.S. Supreme Court."[65] Indeed, *Gary* concluded that OCGA § 17-5-30 is the General Assembly's "unequivocal expression of its desire that evidence seized by means of a warrant that is not supported by probable cause be suppressed" and that the General Assembly enacted the statute to "protect against governmental disregard for constitutionally-protected rights by requiring the integral actors in the warrant-issuing process . . . to respect the probable cause requirements of the Georgia Constitution and to carefully prepare and scrutinize applications for warrants."[66] And

---

[64] *Gary*, 262 Ga. at 574.

[65] *Id.* at 574-75.

[66] *Id.* at 575 (citation omitted); *see also* GA. CONST. Art. I, Sec. I, Para. XIII ("The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue except upon probable cause supported by oath or affirmation particularly describing the place or places to be searched and the persons or things to be seized."). *But see State v. Thackston*, 289 Ga. 412, 416 (2) (716 SE2d 517) (2011) (declining to apply OCGA § 17-5-30 to probation-revocation proceedings); *Stinski v. State*, 281 Ga. 783, 785 (2) (b) (642 SE2d 1) (2007) ("Even [when] an arrest is unlawfully made inside a residence without a warrant, a subsequent statement made outside the residence need not be suppressed on Federal constitutional grounds. [The defendant's] arguments based on OCGA § 17-5-30 (a) are misplaced because that

29

according to the Supreme Court of Georgia, adopting the "good-faith exception" of

*Leon* would be "tantamount to judicial legislation."[67] In reaching this conclusion, the

Court overruled a number of cases relying upon the good-faith exception delineated

in *Leon*.[68]

Since *Gary*, our appellate courts have reiterated (not without offering criticism

at times[69]) that Georgia does not recognize a good-faith exception to the exclusionary

statute concerns 'tangible evidence and is not the proper vehicle to challenge the admissibility of a confession.'" (citation omitted)).

[67] *Gary*, 262 Ga. at 575.

[68] *See id.* at 573 n.1 (recognizing that the Court of Appeals of Georgia applied the *Leon* good-faith exception in *Parris v. State*, 205 Ga. App. 48 (421 SE2d 137) (1992)); *Taylor v. State*, 204 Ga. App. 236 (419 SE2d 56) (1992); *State v. Smith*, 201 Ga. App. 650 (411 SE2d 877) (1991); *Talley v. State*, 200 Ga. App. 442 (408 SE2d 463) (1991); *State v. Morris*, 198 Ga. App. 441 (402 SE2d 288) (1991); *Davis v. State*, 198 Ga. App. 310 (401 SE2d 326) (1991); *Singleton v. State*, 193 Ga. App. 778 (389 SE2d 269) (1989); *Williams v. State*, 193 Ga. App. 677 (388 SE2d 893) (1989); *Betha v. State*, 192 Ga. App. 789 (386 SE2d 515) (1989); *Debey v. State*, 192 Ga. App. 512 (385 SE2d 694) (1989); *State v. Evans*, 192 Ga. App. 216 (384 SE2d 404) (1989); *Adams v. State*, 191 Ga. App. 916 (383 SE2d 378) (1989); *Masson v. State*, 191 Ga. App. 463 (382 SE2d 139) (1989); *Rodriguez v. State*, 191 Ga. App. 241 (381 SE2d 529) (1989)).

[69] *See State v. New*, 331 Ga. App. 139, 146 (3) (770 SE2d 239) (2015) (physical precedent only) ("The fact that [the rational of *Leon*] is not accepted in Georgia, because (as outlined in *Gary*) we have a legislatively created exclusionary rule rather than a judicially created exclusionary rule, makes it no less valid. Without a good faith exception in this context, we essentially demand perfection from police, yet do

rule.[70] And the Supreme Court of Georgia itself later clarified that OCGA § 17-5-30,

as construed in *Gary*, "authorizes *no exception* to Georgia's exclusionary rule when

not require it of prosecutors, defense counsel, or even judges.").

[70] *See Harper v. State*, 283 Ga. 102, 107 (2) (657 SE2d 213) (2008) (". . . Georgia does not have a good faith exception to the search warrant requirement[.]"); *Beck v. State*, 283 Ga. 352, 353 (1) (658 SE2d 577) (2008) ("Georgia does not recognize the good faith exception to its statutory exclusionary rule because our legislature has not provided one."); *Brown v. State*, 330 Ga. App. 488, 492 (2) (767 SE2d 299) (2014) ("[T]he good-faith exception to the exclusionary rule . . . is not applicable in Georgia in light of our legislatively-mandated exclusionary rule found in OCGA § 17-5-30[.]" (punctuation omitted)); *Canino v. State*, 314 Ga. App. 633, 639 (2) n.28 (725 SE2d 782) (2012) ("The Georgia Supreme Court, . . . recognizing that a state has 'power to impose higher standards on searches and seizures than required by the Federal Constitution if it chooses to do so,' has held that the good-faith exception to the exclusionary rule 'is not applicable in Georgia in light of our legislatively-mandated exclusionary rule found in OCGA § 17-5-30.'" (punctuation omitted)); *Miley v. State*, 279 Ga. 420, 422 (614 SE2d 744) (2005) ("Because Georgia law has no good faith exception regarding search warrant requirements, the lack of probable cause necessary for the warrant's issuance requires the suppression of the evidence seized in [the defendant's] house."); *New*, 331 Ga. App. at 142 (2) (physical precedent only) ("Georgia recognizes no good faith exception."); *Randolph v. State*, 264 Ga. App. 396, 401 (2) (590 SE2d 834) (2003) ("Although the United States Supreme Court adopted a 'good faith' exception to the exclusionary rule of the Fourth Amendment in *United States v. Leon*, the Supreme Court of Georgia later concluded in *Gary v. State* that in Georgia a defendant's statutory right to exclusion of evidence has no 'good faith' exception." (footnotes omitted)); *State v. Gallup*, 236 Ga. App. 321, 324 (2) (512 SE2d 66) (1999) ("There is in Georgia no 'good faith' exception to our statutory exclusionary rule[.]").

evidence has been seized unlawfully,"[71] making clear that the lack of a good-faith

exception is not dependent upon whether law enforcement has a search warrant, even

though the facts in *Gary* and *Leon* involved search warrants.[72] Additionally, the

Supreme Court has further explained that *Gary* "did not broaden the definition of

what constitutes an unreasonable search" but instead "provided greater protection

from unreasonable searches by interpreting OCGA § 17-5-30 as a legislative

overruling of the judicially created good faith exception."[73]

Accordingly, in light of *Gary*, we must again conclude that, under our Supreme

Court's interpretation of OCGA § 17-5-30, there is no good-faith exception in

Georgia.[74] And notwithstanding any deviation the Supreme Court has made from

---

[71] *Harvey v. State*, 266 Ga. 671, 672 (469 SE2d 176) (1996) (emphasis supplied).

[72] *See* OCGA § 17-5-30 (a) (1)-(2) (concerning suppression of evidence for illegal searches conducted both with and without a search warrant); *Register v. State*, 281 Ga. App. 822, 824 (637 SE2d 761) (2006) ("Georgia's exclusionary rule, codified at OCGA § 17-5-30, provides for the suppression of evidence obtained by an unlawful search and seizure conducted either with or without a warrant. There is no good-faith exception to this exclusionary rule in Georgia." (punctuation and citation omitted)); *Boatright v. State*, 225 Ga. App. 181, 183 (2) (483 SE2d 659) (1997) (same).

[73] *Brent v. State*, 270 Ga. 160, 162 (2) (510 SE2d 14) (1998).

[74] *See Harvey*, 266 Ga. at 672; *see also supra* note 70.

32

*Gary* in the intervening years,[75] *Gary* remains good law[76] and, as a result, is binding precedent on this Court.[77]

---

[75] *See Harvey*, 266 Ga. at 675-76 (Benham, C.J., dissenting) (attacking majority's attempt to distinguish facts of case so as to avoid reliance upon the "good faith" exception by finding probable cause, and admonishing that "[i]f this court is to turn around so quickly and overrule its holding in *Gary*, to abandon the principles stated in that case, it should do so honestly and forthrightly, not by purporting to honor it, and then deciding a case directly contrary to its principles"); *see also* James P. Fleissner, "Criminal Law and Procedure: A Two-Year Survey," 48 MERCER L. REV. 219, 278-79 (III) (A) (1996) ("Several years ago in *Gary v. State*, the Georgia Supreme Court declined to adopt the good faith exception, holding that Georgia's statutory exclusionary rule, by its terms, recognizes no exception. After the Supreme Court's recent opinion in *Harvey v. State*, it is appropriate to ask the following question about Georgia's recognition of the good faith exception: Does she or doesn't she? . . . The court's analysis [in *Harvey*] sounds a lot like the analysis supporting the good faith exception, but the court's opinion insisted that the good faith exception 'is not implicated by this case.'" (footnotes omitted)). *But see Boatright*, 225 Ga. App. at 184 (2) (distinguishing the holding and reasoning in *Harvey* from *Gary*).

[76] *See Boatright*, 225 Ga. App. at 184 (2) ("[T]he Supreme Court intentionally did not overrule *Gary* [in *Harvey*] but instead factually distinguished it."); *see also State v. Smith*, 308 Ga. App. 345, 351 (1) (707 SE2d 560) (2011) (holding that, despite unquestionable tension between Supreme Court precedents, one of two cases had never been explicitly overruled or disapproved of by the Supreme Court).

[77] *See* GA. CONST., Art. VI, § VI, ¶ VI (1983) ("The decisions of the Supreme Court shall bind all other courts as precedents."); *State v. Jackson*, 287 Ga. 646, 658 (5) (697 SE2d 757) (2010) ("Stare decisis is an important principle that promotes the rule of law, particularly in the context of statutory interpretation, where our incorrect decisions are more easily corrected by the democratic process."); *Morse v. State*, 288 Ga. App. 725, 729 (1) (655 SE2d 217) (2007) (noting that the outcome in that case was compelled by stare decisis); *see also* Kurt T. Lash, "Originalism, Popular Sovereignty, and Reverse Stare Decisis," 93 VA. L. REV. 1437, 1454 (2007) (noting

Nevertheless, we take this opportunity to note that almost twenty years ago, Justice Blackwell (then a law student) questioned the validity of the Supreme Court's conclusion in *Gary*,[78] suggesting that our Supreme Court misconstrued OCGA § 17-5-30, which "does not reflect a legislative command that the courts of the state not receive, in criminal proceedings, any evidence seized illegally" and is instead "merely a procedural device for defendants invoking the exclusionary rule, the substantive limits of which must be found elsewhere."[79] Justice Blackwell also highlighted the similarities between OCGA § 17-5-30 and Federal Rule of Criminal Procedure 41 (e) as it existed when OCGA § 17-5-30 was enacted, noting that the federal courts recognized Rule 41 (e) as being strictly procedural in nature.[80] Finally, Justice

---

that "[v]ertical stare decisis refers to the binding effect of precedent on lower courts," and that "[s]erious rule of law costs would follow if lower courts were free to ignore precedent established by a higher court of appeal").

[78] *See* Keith R. Blackwell, Note, "Gary v. State: The Georgia Supreme Court Dodges a Confrontation with the Good Faith Exception," 32 GA. L. REV. 927 (1998).

[79] *Id.* at 941-42 (III); *see supra* note 53.

[80] Blackwell, *supra*, note 78, at 945 (III) & n.102; *see also* former Fed. R. Crim. P. 41(e) (1964) ("A person aggrieved by an unlawful search and seizure may move the district court for the district in which the property was seized for the return of the property and to suppress for the use as evidence anything so obtained on the ground that (1) the property was illegally seized without warrant, or (2) the warrant is insufficient on its face, or (3) the property seized is not that described in the warrant,

Blackwell criticized *Gary*'s disregard for a basic canon of statutory construction—that "statutes in derogation of traditional common-law principles . . . be strictly construed."[81]

Still, even if *Gary* did not constrain our consideration of this issue and control the conclusion, we would hold that the good-faith exception does not apply in this

---

or (4) there was not probable cause for believing the existence of the grounds on which the warrant was issued, or (5) the warrant was illegally executed. The judge shall receive evidence on any issue of fact necessary to the decision of the motion. If the motion is granted the property shall be restored unless otherwise subject to lawful detention and it shall not be admissible in evidence at any hearing or trial. The motion to suppress evidence may also be made in the district where the trial is to be had. The motion shall be made before trial or hearing unless opportunity therefor did not exist or the defendant was not aware of the grounds for the motion, but the court in its discretion may entertain the motion at the trial or hearing.").

[81] Blackwell, *supra* note 78, at 947-48 (III).

case.[82] Nevertheless, given the above criticisms and considerations, our Supreme Court may wish to revisit *Gary*'s construction of OCGA § 17-5-30.

For all these reasons, we reverse the trial court's denial of Abercrombie's motion to suppress.

*Judgment reversed. Ray, P. J., and Self, J., concur.*

---

[82] *See Chanthasouxat*, 342 F3d at 1280 (IV) (A) (iii) (b) ("We . . . agree with the Fifth Circuit and the Ninth Circuit that the good faith exception to the exclusionary rule established by *United States v. Leon* should not be extended to excuse a vehicular search based on an officer's mistake of law." (citations omitted)); *see also United States v. McDonald*, 453 F3d 958, 962 (II) (7th Cir. 2006) ("Even though [the officer] may have acted in good faith, there is no good faith exception to the exclusionary rule when, as here, an officer makes a stop based on a mistake of law and the defendant is not violating the law."); *United States v. Lopez-Soto*, 205 F3d 1101, 1106 (II) (9th Cir. 2000) ("We have no doubt that [the officer] held his mistaken view of the law in good faith, but there is no good-faith exception to the exclusionary rule for police who do not act in accordance with governing law. To create an exception here would defeat the purpose of the exclusionary rule, for it would remove the incentive for police to make certain that they properly understand the law that they are entrusted to enforce and obey." (citation omitted)); *United States v. Lopez-Valdez*, 178 F3d 282, 289 (II) (C) (5th Cir. 1999) (declining to extend exclusionary rule so as to apply to good-faith mistakes of law).