**FIRST DIVISION**
**BARNES, P. J.,**
**DOYLE, P. J., and LAND, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**June 27, 2023**

# In the Court of Appeals of Georgia

A23A0234. CHAPMAN v. THE STATE.

DOYLE, Presiding Judge.

Joel Edward Chapman appeals from his conviction for trafficking in methamphetamine,[1] arguing that the trial court erred by denying his pretrial motion to suppress. For the reasons that follow, we affirm the trial court's ruling.

Viewed in the light most favorable to the jury's verdict,[2] the record shows that law enforcement officers found 55 grams of methamphetamine in Chapman's car during a traffic stop. He filed a motion to suppress, arguing that officers lacked

---

[1] See OCGA § 16-13-31 (e).

[2] See, e.g., *Cawthon v. State*, 350 Ga. App. 741 (1) (830 SE2d 270) (2019).

probable cause to perform the traffic stop and that he was subjected to a custodial interrogation without being advised of his *Miranda*[3] rights.

At the hearing on Chapman's motion to suppress, Officer Trent Hastings testified that on November 29, 2018, he was observing traffic on Highway 70. The Coweta County Sheriff's Office had received information that Chapman would be traveling southbound on Highway 70 in either a white Ford F-150 or silver Ford Mustang, carrying methamphetamine and heading for Roscoe General Store. At approximately 3:00 p.m., Hastings saw a silver Mustang traveling in the predicted direction, and he observed the car's passenger-side tires travel "well onto" the fog line.[4] Hastings began following the vehicle and activated his lights to initiate a traffic stop, and he recognized the driver to be Chapman because he had looked up Chapman's photo beforehand. According to Hastings, Chapman had ample time to pull over before Chapman encountered a sharp curve in the road, but he did not do so. Additionally, Hastings saw Chapman make a motion with his hands signaling that he would continue driving down the roadway, and based on his experience, Hastings

---

[3] See *Miranda v. Arizona*, 384 U. S. 436, 444-445 (86 SCt 1602, 16 LE2d 694) (1966).

[4] The "fog line" is "the white solid line on the right side of the lane." *State v. Whitfield*, 219 Ga. App. 5, 6 (463 SE2d 728) (1995).

recognized this as a sign that Chapman could be preparing to flee. Hastings notified other officers, and they pulled their vehicle in front of Chapman, forcing him to stop.

Officer Hasting's body camera recording was played during the hearing, and Hastings was questioned extensively about the events depicted in the recording.[5] After Chapman stopped his car, which occurred at approximately 52 seconds into the recording, Hastings and the two other officers on the scene exited their vehicles with their weapons drawn. Chapman put his hands outside the car window and told officers that he had not stopped because there was no place to pull over on the side of the road, and while he was talking an officer responded, "You had plenty of time to stop." Chapman complied with the officers' instructions to exit his car and place his hands on top of the vehicle, and the officers re-holstered their weapons. Hastings asked Chapman if he had any weapons, Chapman answered that he did not, and Hastings guided Chapman toward the back of the car. Then, with Chapman's consent, Hastings began a pat-down search for weapons.

---

[5] Hastings testified that he activated his body camera at about the same time he turned on his blue lights. Upon activation, the camera preserved its video recording of the last 30 seconds and then proceeded to record, in both video and audio, from the moment of activation forward. In other words, the recording played in court included 30 seconds of video prior to Hastings's activation of his camera.

At 1 minute, 39 seconds into the recording, Hastings asked an officer to hand him gloves so he could continue his search of Chapman's pockets. As that officer stepped away to retrieve the gloves, and while Chapman was standing behind his car with his hands on the roof to accommodate Hasting's search, another officer walked closer to Chapman, confirmed that his name was Joel Chapman, and asked, "Do you have anything illegal on you[?]" At 1 minute, 45 seconds into the recording — less than a minute after Chapman stopped his car — Chapman answered "yes," then advised that he had methamphetamine on him. Hastings continued to search Chapman's pockets as Chapman again stated that he had not pulled over because there was no safe place to do so. One minute later, Hastings placed handcuffs on Chapman and told him that he was being "detained" because he admitted he had methamphetamine. When officers asked Chapman what pocket held the methamphetamine, he said he was not sure if it was in his pocket or in the car. At 3 minutes, 14 seconds into the recording, Hastings read Chapman the *Miranda* warnings. Officers subsequently searched Chapman's car and found approximately 55 grams of methamphetamine in the center console. They placed Chapman under arrest, and he stated he was trying to make money for Christmas.

The trial court denied Chapman's motion to suppress, concluding that the stop was valid in light of Chapman's failure to maintain a single lane of traffic, that the officers' interaction with Chapman was a permissible tier-two encounter rather than a custodial interrogation, and that Chapman was advised of his *Miranda* rights before he was placed under arrest. The jury subsequently found Chapman guilty, and the trial court sentenced him to 20 years to serve. This appeal ensued.

1. Chapman contends that the traffic stop was illegal because officers lacked reasonable suspicion to stop his car. He argues that driving on a fog line, but not over it, does not amount to failure to maintain one's lane and insists that officers had no reasonable basis to believe that a driver violated Georgia law by driving on a fog line.

> In reviewing a trial court's decision on a motion to suppress, the evidence is construed most favorably to uphold the findings and judgment of the trial court; the trial court's findings on disputed facts and credibility are adopted unless they are clearly erroneous and will not be disturbed if there is any evidence to support them.[6]

---

[6] (Citation and punctuation omitted.) *Polk v. State*, 305 Ga. App. 677 (700 SE2d 839) (2010).

The trial court's application of law to the facts, however, is subject to de novo review.[7]

"To initiate a traffic stop, an officer must have specific, articulable facts sufficient to give rise to a reasonable suspicion of criminal conduct."[8] It is well-established that "a stop is authorized if the officer observes a traffic violation."[9]

Here, Officer Hastings testified that he stopped Chapman because he saw Chapman drive on the white fog line, which Hastings believed constituted a failure to maintain his lane. That offense is codified at OCGA § 40-6-48 (1), which provides:

> Whenever any roadway has been divided into two or more clearly marked lanes for traffic . . . [a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety[.][10]

---

[7] See *State v. Jacobs*, 342 Ga. App. 476, 477 (804 SE2d 132) (2017).

[8] (Citation and punctuation omitted.) *Acree v. State*, 319 Ga. App. 854, 855 (737 SE2d 103) (2013).

[9] *Tuggle v. State*, 236 Ga. App. 847, 848 (1) (a) (512 SE2d 650) (1999).

[10] OCGA § 40-6-48 (1).

The Georgia Code does not define a "lane" for traffic, and although the term "roadway" is defined as excluding any "berm or shoulder,"[11] it is not clear whether various markings, including fog lines, should be considered part of the lane or outside the lane. Our law is clear that if a driver crosses a fog line, he violates OCGA § 40-6-48 (1).[12] But the parties have not identified any case where a driver was convicted of violating OCGA § 40-6-48 (1) because he touched, but did not cross, a fog line or other painted boundary line. Indeed, in a recent case where the trial court found that the defendant "was weaving within his lane between lane line and fog line and touching the lines[,]" we concluded that there was insufficient evidence to support a conviction for failure to maintain lane.[13] Additionally, a federal district court has determined that "lane touching," without weaving or other conduct that might suggest

---

[11] OCGA § 40-1-1 (53) ("'Roadway' means that portion of a highway improved, designed, or ordinarily used for vehicular travel, exclusive of the berm or shoulder.").

[12] See *Phillips v. State*, 338 Ga. App. 231, 232-233 (789 SE2d 421) (2016) (where video clearly showed that the defendant's tires "at a minimum, reach[ed] the fog line," but did not allow the court to see "how far the tires crossed onto and/or over the fog line[,]" there was evidence that the defendant violated OCGA § 40-6-48 (1) because an officer testified that the defendant crossed the line).

[13] See *Lute v. State*, __ Ga. App. __ (Case No. A23A0449, decided June 8, 2023).

7

incapacity, did not constitute a Georgia traffic violation.[14] After considering the parties' arguments on this issue, including the cases cited in their briefs, during oral arguments, and in the Appellant's supplemental brief, we hold today that under Georgia law, a motorist does not violate OCGA § 40-6-48 (1) when he drives on, but does not cross over, a fog line.

Our holding, however, does not resolve the question of whether Officer Hastings was authorized to stop Chapman. Again, "[i]n order to initiate a traffic stop, a law-enforcement officer must have specific and articulable facts that provide a reasonable suspicion that the individual being stopped is engaged in criminal activity."[15] Where an officer reasonably but mistakenly believes that certain conduct violates the law, the observation of that conduct can serve as reasonable suspicion if the officer's mistake of law was objectively reasonable.[16] To determine whether an officer's mistake of law was reasonable, courts must engage in a "straightforward

---

[14] See *United States v. Hernandez*, 17 F.Supp.3d 1255, 1257 (5) (N. D. Ga. 2014).

[15] (Citations and punctuation omitted.) *Abercrombie v. State*, 343 Ga. App. 774, 777 (1) (808 SE2d 245) (2017).

[16] See id. at 781-782 (2) (a) (discussing *Heien v. North Carolina*, 574 U. S. 54, 60 (135 SCt 530, 190 LEd2d 475) (2014)).

question of statutory construction[.]"[17] "[I]f the law in question is genuinely ambiguous, such that overturning the officer's judgment requires hard interpretive work, then the officer has made a reasonable mistake."[18]

For the reasons discussed above, we conclude that until our holdings in *Lute* and the instant case, Georgia law was genuinely ambiguous as to whether driving on a fog line, but not across that line, amounts to a failure to maintain one's lane in violation of OCGA § 40-6-48 (1). Crucially, our Code does not define many of the operative terms, including "lane." Chapman argues that Hastings's mistaken belief that driving on the fog line is a violation of Georgia law was not reasonable. He likens driving on the fog line to weaving within one's lane of traffic and emphasizes that, under well-established law, weaving within a single lane of traffic does not amount to failure to maintain one's lane.[19] But even considering that body of

---

[17] (Citation and punctuation omitted.) *Abercrombie*, 343 Ga. App. at 783-784 (2) (a).

[18] (Citation and punctuation omitted.) Id. at 784 (2) (a).

[19] See *Semich v. State*, 234 Ga. App. 89, 90-91 (a)-(b) (506 SE2d 216) (1998) ("[W]eaving within one's own lane generally does not constitute a traffic offense[,]" though it "may serve as sufficient reason to warrant an investigative stop for a possible DUI violation.") (citations and punctuation omitted).

9

precedent, we conclude that, until our holdings in *Lute* and this case, Georgia's law was genuinely ambiguous as to whether driving on a fog line amounts to a failure to maintain one's lane. Consequently, Hastings's mistaken belief that such conduct violates the law was objectively reasonable, and the traffic stop in this case was justified.

2. Chapman next argues that, even if the initial stop was valid, the officers immediately abandoned any investigation into the traffic offense and pursued a drug investigation without reasonable articulable suspicion to do so.

> Encounters between police officers and citizens come in three varieties, at least as far as the Fourth Amendment is concerned: tier one encounters involving no coercion or detention, which are outside the purview of the Fourth Amendment altogether; tier two brief seizures, which require an officer to have a reasonable suspicion of criminal wrongdoing; and tier three custodial arrests, which require probable cause.[20]

---

[20] (Citation and punctuation omitted.) *Sims v. State*, 335 Ga. App. 625, 627-628 (782 SE2d 687) (2016).

To justify a second-tier encounter, officers must have "a particularized and objective basis for suspecting that [the individual] is involved in criminal activity."[21] This standard generally is not met by an anonymous tip alone.[22] However, "if the tip is detailed enough to provide some basis for predicting the future behavior of the suspect, reliability may be established if the details are corroborated by the observations of the police."[23]

The trial court concluded that in the limited amount of time between the traffic stop and the officers' questioning of Chapman, their interaction with him was a permissible tier-two encounter. We agree because, by the time the officers spoke with Chapman outside his car, the following facts were in play: the officers had received an anonymous tip that Chapman would be driving one of two cars on Highway 70

---

[21] (Citation and punctuation omitted.) *State v. Gauthier*, 326 Ga. App. 473, 475 (1) (756 SE2d 705) (2014).

[22] See *State v. Holloway*, 286 Ga. App. 129, 131 (648 SE2d 473) (2007) ("'[A]rticulable suspicion' may not be grounded in an anonymous tip alone.") (citation and punctuation omitted).

[23] *State v. Dukes*, 279 Ga. App. 247, 250 (630 SE2d 847) (2006) (where an anonymous tipster told police that the defendant was dealing drugs at a certain location, and an officer saw the defendant at the specified location and observed him twice walk away from another man after seeing the police car, the officer lacked reasonable suspicion to conduct a second-tier detention because the tip did not predict any future behavior).

11

toward Roscoe General Store, carrying methamphetamine; Officer Hastings had observed Chapman driving one of those cars in that direction; and Hastings had seen Chapman make arm motions indicating that he would continue driving before pulling over, which Officer Hastings testified was a sign, in his experience, that an individual was planning to flee.

As outlined above in Division 1, the traffic stop that led to Chapman's arrest was not illegal. And while Officer Hastings was effectuating that stop, he recognized that it was Chapman who was driving a silver Ford Mustang on Highway 70 in the direction of Roscoe General Store. These observations of Chapman's actual conduct matched the conduct that was predicted by the anonymous tip, thereby giving the other allegations contained in the tip — including the allegation that Chapman was carrying methamphetamine — an indicia of reliability.[24] Additionally, Hastings observed Chapman make motions suggesting that he was planning to flee, and "[f]light is a circumstance sufficient to give an articulable suspicion of illegal

_____

[24] See *Alabama v. White*, 496 U. S. 325, 327, 331 (110 SCt 2412, 110 LE2d 301) (1990) (where anonymous tipster alleged that a particular woman would drive a brown Plymouth station wagon with a broken taillight from a particular apartment to a particular hotel at a particular time, while carrying cocaine, officers' observation of an unidentified woman leaving the apartment building, entering a station wagon that matched the description, and driving toward the specified motel provided sufficient corroboration to furnish reasonable suspicion that she possessed cocaine).

12

activity."[25] Under the totality of these circumstances, the officers were justified in conducting a second-tier encounter to investigate whether Chapman was carrying methamphetamine.

3. Finally, Chapman argues that even if his detention was lawful, the officers violated his rights by conducting a custodial interrogation without first reading him *Miranda* warnings. Central to this argument is Chapman's claim that he was in custody, for purposes of *Miranda*, from the moment officers ordered him to exit his car.

The law recognizes that, because even an ordinary traffic stop curtails the motorist's freedom of action and imposes some pressure on him to answer questions, the fact that a motorist has been detained does not necessarily mean *Miranda* has been triggered.[26]

> [T]o determine whether an individual was "in custody" for purposes of *Miranda*, the test is whether a reasonable person in the detainee's position would have thought the detention would not be temporary.

---

[25] *Tuggle*, 236 Ga. App. at 849 (1) (c).

[26] See *State v. Hammond*, 313 Ga. App. 882, 885 (723 SE2d 89) (2012); *Thomas v. State*, 294 Ga. App. 108, 110 (1) (668 SE2d 540) (2008) (*Miranda* protections arise when a suspect "is placed in custody or under arrest at a traffic stop[.]").

Under this test, a person is in custody for purposes of *Miranda* only if a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest.[27]

The State contends that the instant case is analagous to *United States v. Acosta*,[28] where five or six officers, at least one with their gun drawn, pulled their cars behind the defendant in a parking lot. An officer immediately told the defendant he was not under arrest but that they wanted to talk to him about money laundering, asked for identification, and patted him down.[29] Additionally, an officer asked the defendant "if he had any money, weapons, or drugs in the car," and the defendant answered no but gave the officers written consent to search his car.[30] Before the search took place, the defendant admitted there was money in the car, and a subsequent search uncovered $278,000 in cash.[31] The Eleventh Circuit Court of Appeals determined that the defendant was not in custody for purposes of *Miranda*

---

[27] (Citations and punctuation omitted.) *Hammond*, 313 Ga. App. at 885-886.

[28] 363 F3d 1141 (11th Cir. 2004).

[29] Id. at 1143 (I).

[30] Id.

[31] Id.

when he consented to the search.[32] In its opinion, the court emphasized that the interaction occurred in broad daylight in an apartment complex parking lot rather than in a remote area far from public scrutiny and that the defendant was not questioned at gunpoint, remained standing the entire time, was not subjected to physical force, was not handcuffed, and was told he was not under arrest.[33]

Here, during a valid tier-two encounter, three officers approached Chapman's car with their guns drawn and instructed Chapman to exit his vehicle. As the Eleventh Circuit has recognized, "the mere fact that an officer drew his weapon does not transform an otherwise lawful stop into an unlawful detention."[34] The officers reholstered their weapons as soon as Chapman complied with their instructions, and Officer Hastings immediately began to search Chapman for weapons. As Hastings obtained gloves to complete the search, to which Chapman had consented, another officer asked Chapman, "Do you have anything illegal?" Chapman responded that he had methamphetamine. Officer Hastings then advised Chapman that he was being detained based on his admission, read Chapman his *Miranda* warnings, and placed

---

[32] Id. at 1150 (IV).

[33] Id.

[34] *United States v. Gibbs*, 917 F3d 1289, 1297 (III) (11th Cir. 2019).

Chapman in handcuffs. All of this occurred less than three minutes after Chapman stopped his car. And again, for the reasons discussed in Division 2, when officers approached Chapman's car they were justified in conducting a second-tier encounter to investigate whether Chapman was carrying methamphetamine.

We agree with the State that these facts are analogous to the situation presented in *Acosta*. Here, as in *Acosta*, the stop occurred in daylight and not in a remote area, Chapman was not questioned at gunpoint and remained standing throughout the entire interaction, and no physical force was used. Additionally, the question at issue — "Do you have anything illegal?" — was asked less than three minutes into a lawful detention. Although Chapman was eventually handcuffed and placed in the police car, that happened after he told officers that he had methamphetamine either in his pocket or in his car. Under these circumstances, we reject Chapman's contention that he was subjected to custodial interrogation in violation of his *Miranda* rights.

*Judgment affirmed. Barnes, P. J., and Land, J., concur.*