**THIRD DIVISION**
**MILLER, P. J.,**
**RAY and BRANCH, JJ.**

NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

**March 25, 2013**

# In the Court of Appeals of Georgia

A12A2036. ELLICOTT v. THE STATE                                    MI-077 C

MILLER, Presiding Judge.

Following his conviction by a jury of five counts of aggravated battery (OCGA § 16-5-24 (a)), four counts of aggravated assault (OCGA § 16-5-21 (a) (2)), rape (OCGA § 16-6-1 (a) (1)), two counts of aggravated sodomy (OCGA § 16-6-2 (a) (2)), and one count of false imprisonment (OCGA § 16-5-41 (a)).[1] Michael Ellicott appeals from the denial of his motion for new trial. Ellicott contends that the trial court erred (1) in failing to excuse a biased juror for cause; (2) in preventing him from presenting evidence of his reputation for nonviolence; (3) in failing to create a record of its in camera review of potential *Brady* material; and (4) by acting in a coercive manner

---

[1] Ellicott was charged with, and acquitted of a sixth aggravated battery charge, and a fifth aggravated assault charge.

towards the jury during their deliberations. Ellicott also contends that (5) the trial court was biased against Ellicott, thereby violating his right to a fair trial, and (6) trial counsel was ineffective for failing to impeach the victim with her prior sworn testimony. For the reasons that follow, we affirm Ellicott's convictions.

> On appeal from a criminal conviction, a defendant no longer enjoys the presumption of innocence, and the evidence is viewed in the light most favorable to the guilty verdict. . . . [W]e neither weigh the evidence nor assess the credibility of witnesses, but merely ascertain that the evidence is sufficient to prove each element of the crime beyond a reasonable doubt. Moreover, conflicts in the testimony of the witnesses are a matter of credibility for the jury to resolve. As long as there is some competent evidence, even though contradicted, to support each fact necessary to make out the State's case, the jury's verdict will be upheld.

(Punctuation and footnotes omitted.) *Goss v. State*, 305 Ga. App. 497, 497-498 (1) (699 SE2d 819) (2010).

So viewed, the evidence shows that Ellicott and the victim were married, and lived in Fayette County. Ellicott physically abused the victim for more than a year prior to January 2009. Ellicott's physical abuse included slapping the victim's head, punching her in the arm with closed-fists, forcing her to have intercourse, holding her underwater, and beating her. On one occasion in late October 2008, Ellicott told the

2

victim to stick her anus on his penis, he forced the victim to climb on top of him facing backwards, and his penis came in contact with the victim's anus (Count 15). On other occasions, Ellicott forced the victim's head down on his penis and held her there until she gagged. Ellicott repeatedly threatened to hunt her down, torture her and kill her if she ever tried to leave him, or told anyone about the physical abuse. Ellicott also forced the victim to write down that any injuries she had were self-inflicted.

In early January 2009, Ellicott broke the victim's right wrist, while he was beating her with his fists and a drumstick (Count 14). The victim put her arm up to block a blow to her head and heard her arm crack. A week or so later, Ellicott put his hand around the victim's throat, threw her off the bed onto her back, put his other hand around the victim's mouth and nose so that she could not breathe, and sat on the victim (Count 12). Ellicott then beat and punched the victim (Count 11), and forced her head down onto his penis until she threw up (Count 13). The next day, Ellicott beat the victim again, and he forcibly raped her (Count 9). On one of those occasions, Ellicott also broke the victim's left wrist while beating her (Count 10).

On January 20, 2009, Ellicott came home early from a trip and took the victim down to the soundproof home theater in their basement. Ellicott told the victim to

3

drop to her knees and began beating her with a drumstick. Ellicott noticed that the victim had on extra clothing, so he made the victim strip from the waist down, he pushed her back on her knees and continued beating her with the drumstick on her buttocks, legs, back and arms (Count 5), and he kicked the victim which his shoe-clad foot (Count 1). When the victim pleaded with Ellicott to stop, he made her stand up and he punched and beat her in the chest area (Count 7). Ellicott then told the victim to get cleaned up and left the home theater.

The victim went to the basement bathroom, changed out of her bloody shirt, hid the shirt in the basement bedroom under some covers and ran upstairs to the office on the third floor. While the victim was upstairs in the office, Ellicott punched her in the head with his fists, kicked her in the buttocks, and kicked and kneed her in the groin and vaginal area (Count 6). Ellicott went downstairs to eat, then called the victim to come down to the family area. Ellicott then hit the victim in the head again, told her to stand up and kicked and kneed her in the same places as before.

Ellicott then took the victim back down to the basement theater, pushed down on knees, and beat her savagely with the drumstick on her buttocks, legs, back and arms. Ellicott made the victim stand up and lift up her shirt, he twisted and punched her nipples, making them bleed, (Count 2) and he hit her across the breasts, head and

4

stomach with the drumstick. Ellicott then told the victim to run upstairs and get some ice for her head which had started to bleed. After she put some ice in a shopping bag, Ellicott made the victim return back downstairs where he beat her again from head to toe (Count 3).

When Ellicott got a phone call, he told the victim to go into the downstairs bedroom, where she sat on the bed and realized that Ellicott was going to kill her that night if she did not leave immediately. While Ellicott was in the theater on the phone, the victim left the bedroom, ran to the downstairs playroom, grabbed a cordless phone, and ran upstairs where she showed her daughter some of the bruising and told her daughter that they had to go. The victim and her daughter then ran downstairs, out the front door, and to the next door neighbor's house, where the victim called 911.

The victim was taken to the hospital where the emergency trauma team evaluated her, using X-rays and CT scans, and an orthopaedic surgeon operated on the victim's right wrist. After the victim was released from the hospital, she underwent outpatient wound care, including a debriding process on her buttocks which involved removing dead skin to see how deep her wounds were. The victim also had surgery on her buttocks, which left her unable to lay down on her back, and made it painful to sit and walk.

5

Ellicott was charged with seven counts of aggravated battery, six counts of aggravated assault, rape, and aggravated sodomy. Following a jury trial, Ellicott was convicted on all of these counts, except for one aggravated battery charge, and one aggravated assault charge. The trial court denied Ellicott's motion for new trial.

1. Ellicott contends that the trial court erred in failing to excuse a biased juror for cause. We do not agree.

> Whether to strike a juror for cause is within the sound discretion of the trial court. And inasmuch as the trial court's conclusion on bias is based on findings of demeanor and credibility, which are peculiarly within the trial court's province, those findings are to be given deference.

(Citations and punctuation omitted.) *Wolfe v. State*, 273 Ga. 670, 672 (2) (544 SE2d 148) (2001). "In order to disqualify a juror for cause, it must be established that the juror's opinion was so fixed and definite that it would not be changed by the evidence or the charge of the court upon the evidence." (Citations and punctuation omitted.) *Nobles v. State*, 201 Ga. App. 483, 487 (7) (411 SE2d 294) (1991). Moreover, where a qualified juror indicates that he can and will evaluate the evidence fairly, the party who wishes to eliminate him must use a peremptory strike. See *Watts v. State*, 200 Ga. App. 54, 55 (2) (406 SE2d 562) (1991).

6

During initial voir dire, all of the potential jurors affirmatively indicated that they had not formed or expressed an opinion with regard to Ellicott's guilt or innocence, were not biased or prejudiced either for or against Ellicott, and were perfectly impartial between the State and Ellicott. See OCGA § 15-12-164 (setting forth the questions jurors shall be asked on voir dire examination in a felony trial). On individual voir dire, the potential juror in question stated that she read a newspaper article describing the worst abuse case in the State of Georgia. She also stated that she read a second article containing facts about the allegations in the case, and that she heard the accused could not get out on bond. She stated, however, that she did not know the judge or whether the judge had made any findings, and she again affirmatively stated that she had not formed an opinion in the case. Based on the juror's voir dire statements, the trial court denied Ellicott's motion to excuse the potential juror for cause.

Ellicott has failed to show that the potential juror's opinion was so fixed and definite that it would not be changed by the evidence or the trial court's evidentiary charge. See *Noble*, supra, 201 Ga. App. at 487-488 (7) (holding that the trial court did not abuse its discretion in refusing to strike for cause two potential jurors who had heard and/or read about the case, but indicated that they could render a fair and

impartial verdict based on the evidence presented). Accordingly, the trial court did not abuse its discretion in refusing to excuse the potential juror for cause.

2. Ellicott contends that the trial court erred in preventing him from presenting evidence of his reputation for nonviolence, arguing that the testimony did not relate to specific acts and had a direct bearing on his sole defense. We disagree.

We apply an abuse of discretion standard when reviewing a trial court's ruling on evidentiary matters. See *McIntosh v. State*, 247 Ga. App. 640, 641 (1) (545 SE2d 61) (2001). A defendant may offer proof of his general reputation in the community for a specific trait through the testimony of character witnesses. See *Walker v. State*, 264 Ga. 676, 677 (2) (449 SE2d 845) (1994); *Jones v. State*, 257 Ga. 753, 758 (1) (363 SE2d 529) (1988). Evidence of specific acts, however, is not admissible to show a defendant's good character. See *Brooks v. State*, 236 Ga. App. 604, 605 (1) (512 SE2d 693) (1999).

Ellicott presented the testimony of two defense witnesses who had worked with Ellicott for three to four years. Trial counsel asked the first defense witness whether Ellicott had a reputation in the community for nonviolence. The State objected on the ground that the question involved specific acts, and the trial court sustained the State's objection.

8

Pretermitting whether the trial court's reason for sustaining the State's objection was correct, Ellicott cannot show that the trial court excluded admissible character evidence. Neither witness was familiar with Ellicott's reputation in the community in which he resided with the victim, and character testimony is not admissible unless is relies on the defendant's general reputation in the community. See *Thomas v. State*, 282 Ga. 894, 896 (2) (a) (655 SE2d 599) (2008). Nevertheless, we note that both witnesses testified that Ellicott had a good reputation in their work community, he was a law-abiding person, and they would believe him under oath. The first witness also viewed photographs of the victim's injuries and testified that nothing about his prior dealings with Ellicott suggested that he would have caused those injuries. Thus, contrary to Ellicott's contention, the trial court allowed the first witness to give testimony directly related to Ellicott's sole defense that he did not cause the victim's injuries.

3. Ellicott contends the trial court erred in failing to create a record of its in camera review of potential *Brady* material. We discern no error.

> The appellant has the burden of showing he was denied material exculpatory information such that he was denied a fair trial. If the trial court performs an in camera inspection and denies the defendant access to certain information, on appeal the appellant has the burden of

9

showing both the materiality and the favorable nature of the evidence sought. Mere speculation that the items the appellant wishes to review possibly contain exculpatory information does not satisfy this burden. If the appellant desires to have this inspection reviewed by this [C]ourt, [he] must point out what material [he] believes to have been suppressed and show how [he] has been prejudiced.

(Citations and punctuation omitted). *Williams v. State*, 251 Ga. 749, 789 (312 SE2d 40) (1983). Following an in camera inspection, the trial judge's discretionary ruling that the State's file contains no exculpatory evidence satisfies the *Brady* requirement, absent a counter-showing. See *Barnes v. State*, 157 Ga App. 582, 586 (2) (277 SE2d 916) (1981).

Relying on *McNeal v. State*, 263 Ga. 397, 398-399 (4) (435 SE2d 47) (1993), Ellicott argues that this case should be remanded to the trial court with direction to conduct a post-trial in camera inspection of the records from the victim's therapist for potential *Brady* material, and to create a record of its findings. In *McNeal*, the Georgia Supreme Court remanded the case to the trial court for a post-trial examination of the State's file because the defendant requested an in camera review of the State's file and the record did not show that the trial court held the requested review. See *McNeal*, supra, 263 Ga. at 398-399 (4).

10

Here, the record shows, and Ellicott acknowledges, that the trial court held an in-camera review of the records in question during the trial. The record further reflects that Ellicott received at least a "snippet or two" of the therapist's confidential records following the trial court's review. Although Ellicott criticizes the trial court's failure to preserve the therapist's records and to make a record of the material it turned over to trial counsel for appellant review, Ellicott did not object to the manner in which the trial court carried out the in-camera inspection prior to his motion for new trial. Furthermore, Ellicott failed to point out what material he believes to have been suppressed or how he was prejudiced thereby. There is no logical basis to presume that the trial judge failed to do his duty by turning over only a snippet of the therapist's records following the in camera inspection. See *Barnes*, supra, 157 Ga. App. at 586 (2). Moreover, the trial court's discretionary ruling on the lack of additional exculpatory evidence in those records was established as a fact, because Ellicott did not show that the suppressed documents were material. See id; see also *Pollard v. State*, 260 Ga. App. 540, 544 (4) (580 SE2d 337) (2003). Accordingly, this enumeration of error is without merit.

4. Ellicott contends that the trial court's comments during the sentencing phase of his trial violated Canon 3 (E) (1) of the Georgia the Code of Judicial Conduct, and deprived Ellicott of his right to a fair trial. We do not agree.

"There is no duty for a trial judge to sua sponte recuse himself absent a violation of a specific standard of OCGA § 15-1-8 or Canon 3 (E) (1) (a) through (c) of the Code of Judicial Conduct, which is not waived by a party after disclosure." (Punctuation and footnote omitted). *Hargrove v. State*, 299 Ga. App. 27, 31 (2) (681 SE2d 707) (2009).

> Canon 3 (E) (1) states that judges shall disqualify themselves in any proceeding where their impartiality might reasonably be questioned. The phrase "impartiality might reasonably be questioned" has been interpreted to mean the existence of a reasonable perception of lack of impartiality by the judge, held by a fair minded and impartial person based upon objective fact or reasonable inference; it is not based upon the perception of either interested parties or their lawyer-advocates. A trial judge's failure to sua sponte recuse himself will warrant reversal only where the conduct or remark of the judge constitutes an egregious violation of a specific ethical standard, and it must support the inescapable conclusion that a reasonable person would consider the judge to harbor a bias that affects his ability to be impartial.

12

(Punctuation and footnote omitted). Id. at 31-32 (2). Moreover, "[t]o merit recusal, any alleged bias must be of such a nature and intensity to prevent the defendant from obtaining a trial uninfluenced by the court's prejudgment." (Citation and punctuation omitted.) *Lemming v. State*, 292 Ga. App. 138, 141 (1) (663 SE2d 375) (2008). Ellicott failed to point to any conduct or remark by the trial court during the trial that would meet this standard, and we have found no such conduct in our examination of the record. See *Hargove*, supra, 299 Ga. App. at 32 (2).

Nevertheless, Ellicott argues that the trial court's comments during his sentencing provide clear evidence of the trial judge's substantial bias against him. During the sentencing hearing, prior to pronouncing sentence, the trial judge commented on the evidence and Ellicott's demeanor during the trial. The trial court compared Ellicott's conviction to the "death of a monster," and commented that, given his family's history, Ellicott should have committed suicide. The trial court also stated that he was imposing a sentence that would insure that Ellicott would spend his life confined to a small cell where he would spend every day thinking about the freedom that he once had.

> When sentencing, a trial court may consider any evidence that was
> properly admitted during the guilt-innocence phase of the trial, and may

13

also consider the conduct and attitude of the defendant during trial. A trial court should not, however, take into account when sentencing any considerations that are not clearly shown by the evidence of record.

(Punctuation and footnote omitted). *Blake v. State*, 273 Ga. 447, 450 (1) (542 SE2d 492) (2001); see also *Valentine v. State*, 289 Ga. App. 60, 63-64 (3) (656 SE2d 208) (2007). Pretermitting whether the trial court's comments took into account any considerations that were not clearly shown by the evidence of record, we conclude that the comments did not result in any prejudice to Ellicott, because his sentences were well within applicable statutory limits.[2]

5. Ellicott contends that the trial court erred by acting in a coercive manner towards the jury during their deliberations. We disagree.

After the jury has had a case under consideration for some time, the trial court may inquire how the jury stands numerically. See *Wilson v. State*, 145 Ga. App. 315,

---

[2] OCGA § 16-6-1 (b) authorized Ellicott's life sentence for rape. Ellicott's consecutive life sentences for the two counts of aggravated sodomy were also authorized. See OCGA § 16-6-2 (b) (2). OCGA § 16-5-24 (b) authorized Ellicott's consecutive 20-year sentence on the first aggravated battery count. Finally, Ellicott's 20-year concurrent sentences on the remaining counts of aggravated battery and aggravated assault, as well as his 10-year concurrent sentence for false imprisonment were also authorized. See OCGA § 16-5-24 (b) (aggravated battery), OCGA § 16-5-21 (b) (aggravated assault), OCGA § 16-5-41 (b) (false imprisonment).

320 (4) (b) (244 SE2d 355) (1978). It is not error for the trial court to inquire how the jury stands if the trial court does not intimate or express an opinion on the facts or attempt to induce the jury to make a verdict. See id. at 319 (4) (b). Moreover, "giving an *Allen* charge after inquiring into the numerical division of the jury where there is no announcement of which way the vote is split, is not coercive as it does not place undue pressure on the jurors to abandon their convictions." (Citation and punctuation omitted.) *Lowery v. State*, 282 Ga. 68, 71-72 (4) (a) (646 SE2d 67) (2007).

Here, after nearly a full day of jury deliberations, the following colloquy took place between the trial court and the jury foreperson:

THE COURT: . . .I'm looking for something like how you are divided, not as to one way or the other, just a number. Can you tell me –

JURY FOREPERSON: You just want a number?

THE COURT: I do.

JURY FOREPERSON: Eleven/one.

THE COURT: Eleven/one?

JURY FOREPERSON: Yes..

THE COURT: Is that on most counts or - -

JURY FOREPERSON: Yes.

15

THE COURT: - - that you've examined?

JURY FOREPERSON: Yes, sir.

THE COURT: Okay. But you feel like you're making progress?

JURY FOREPERSON: Yes, sir.

THE COURT: Okay. Well, thank you. That's all I wanted to check on. All right. You can retire to the jury room. Thank you.

Trial counsel objected to this colloquy, and asked the trial court to give an *Allen* charge. The trial court declined to give an *Allen* charge at that time. Thereafter, the jury deliberated for another hour before sending the trial court a note stating that the jury had reached a verdict on two counts and they were split 11 - 1 on the remaining thirteen counts. The trial court confirmed that the jury was still making progress and sent the jury back for further deliberations. Approximately one and one-half hours later, the jury sent a note informing the trial court that they were deadlocked 11-1 on the remaining thirteen counts. At that time, the trial court gave the jury an *Allen* charge. The jury returned their verdict approximately one and one-half hours later.

Here, the trial court inquired into the jury's numerical division after nearly a full day of deliberations. The trial court did not seek information as to how the jurors

16

had voted, the trial court did not intimate or express an opinion on the facts or attempt to induce the jury to make a verdict, and the jury foreperson only divulged the numerical split without any reference to whether the number was for guilt of innocence. See *Wilson*, supra, 145 Ga. App. at 319 (4) (b). Moreover, the trial court's subsequent *Allen* charge after inquiring into the jury's numerical division was not coercive and did not place undue pressure on the jurors to abandon their convictions. See *Lowery*, supra, 282 Ga. at 72 (4) (a). Accordingly, Ellicott has failed to show that the trial court erred.

6. Ellicott contends that trial counsel was ineffective for failing to impeach the victim with her prior sworn testimony that directly contradicted the physical evidence in the case. Again, we disagree.

> To prevail on a claim of ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and that the deficient performance so prejudiced the defendant that there is a reasonable likelihood that, but for counsel's errors, the outcome of the trial would have been different. [See] *Strickland v. Washington*, 466 U. S. 668, 687 [104 SC 2052, 80 LE2d 674] (1984). If an appellant fails to meet his or her burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong. In reviewing the trial court's decision, we accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we

17

independently apply the legal principles to the facts. Furthermore, there is a strong presumption that the performance of counsel was within the wide range of reasonable professional lawyering, and we cannot reach a contrary conclusion unless defendant successfully rebuts the presumption by clear and convincing evidence. Judicial scrutiny of counsel's performance must be highly deferential.

(Citations and punctuation omitted.) *Davenport v. State*, 316 Ga. App. 234, 239 (3) (729 SE2d 442) (2012).

Ellicott argues that trial counsel should have impeached the victim with her prior sworn testimony in a 2006 deposition in which the victim stated that following surgery in 2004 to repair a difficult episiotomy, she was unable to have intercourse without experiencing pain, tearing and bleeding. At the hearing on Ellicott's motion for new trial, trial counsel testified that he could not recall a strategic reason for not cross-examining the victim regarding her prior testimony concerning the episiotomy procedure and the tearing and pain she experienced during intercourse. Trial counsel testified, however, that he read the deposition with Ellicott prior to trial, and that the victim's prior testimony was not relevant to the specific facts of this case. In fact, trial counsel stated that portions of the deposition testimony might have hurt Ellicott's defense. Trial counsel testified that Ellicott's defense theory focused on his assertion

18

that he loved his wife, he would not have done anything to hurt her, he did not commit the crimes and the victim's wounds were self-inflicted. Trial counsel testified that introducing evidence that Ellicott continued to have regular sexual intercourse with the victim that caused her great pain could have helped the prosecution and undermined the defense theory that Ellicott was a caring husband. Finally, counsel agreed that the victim's testimony and the photographs of her injuries were very powerful evidence, and the jury rejected the theory that the victim's wounds were self-inflicted.

"Whether to impeach prosecution witnesses and how to do so are tactical decisions." (Citation and punctuation omitted.) *McMichael v. State*, 305 Ga. App. 876, 878 (700 SE2d 879) (2010). "This Court will not, with benefit of hindsight, second-guess defense trial strategies therein. Absent a strong showing that counsel's actions were not reasonable, we will presume that these strategies were not deficient." (Citation and punctuation omitted.) *Raymond v. State*, 298 Ga. App. 549, 550-551 (1) (a) (680 SE2d 598) (2009). In light of trial counsel's testimony that portions of the deposition testimony might have hurt the defense, Ellicott did not show that trial counsel's failure to impeach the victim with her deposition testimony was unreasonable. Moreover, given the overwhelming evidence, Ellicott failed to show

19

that the outcome of his trial would have differed if trial counsel had impeached the victim with her prior sworn testimony. See *Allen v. State*, 286 Ga. 392, 398 (5) (a) (687 SE2d 799) (2010). Accordingly, the trial court did not err when it found that Ellicott failed to carry his burden of showing ineffective assistance of counsel.

*Judgment affirmed. Ray and Branch, JJ., concur.*