**THIRD DIVISION**
**DOYLE, P. J.,**
**HODGES and WATKINS, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**March 7, 2025**

# In the Court of Appeals of Georgia

A24A1832. RAMIREZ v. THE STATE.

HODGES, Judge.

Following a jury trial, the Superior Court of Athens-Clarke County entered a judgment of conviction against Jose Antonio Ramirez on one count each of first degree burglary (OCGA § 16-7-1 (b)), false imprisonment (OCGA § 16-5-41 (a)), theft by taking (OCGA § 16-8-2), battery (OCGA § 16-5-23.1 (a)), and simple battery (OCGA § 16-5-23).[1] Ramirez appeals from the trial court's denial of his motion for new trial as amended, arguing that the trial court erred in both denying his motion to suppress

---

[1] The State originally indicted Ramirez for the crimes of robbery by force, aggravated assault, and criminal attempt to commit a felony. However, the jury found Ramirez guilty of the lesser included offenses of theft by taking, battery, and simple battery, respectively. The trial court merged Ramirez's conviction for simple battery into his battery conviction at sentencing.

and in imposing an overly harsh sentence in view of his acquittal of certain crimes. He further contends that he received ineffective assistance of trial counsel. Finding no error, we affirm.

Viewed in a light most favorable to the verdict,[2] the evidence revealed that the victim and her roommates were living at the Steeplechase Condominiums on Oconee Street in Athens, Clarke County, on October 25, 2019. The victim walked from her apartment to meet a friend at a downtown Athens bar between 11:00 p.m. and midnight, staying at the bar until it closed at 2:00 a.m. on October 26, 2019. After getting sandwiches from a nearby convenience store, the victim and her friend encountered an intoxicated man lying on his back on the sidewalk. The two asked the man if he was okay, and the victim's friend offered to walk him to her apartment. At that point, the victim and her friend parted ways, and the victim began walking toward her apartment.

When the victim returned to her apartment and began to unlock the door, she felt a hand cover her mouth and another hand grab her from behind. The two entered the victim's apartment and the victim turned and saw her attacker's face. During this

---

[2] See, e.g., *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979). Ramirez does not contest the sufficiency of the evidence.

2

initial encounter, the man also grabbed the victim's cell phone from her hands. She repeatedly told the man, whom she did not know and whose face was not covered, to leave and that her roommate was home; the man kept repeating that he could not leave because "[his] boss is making [him] do this." The victim alternated pleas with the man that he did not have to do what his boss ordered with screams for one of her roommates. As the victim realized that the man would not leave and that it would be difficult to rouse her roommate, the victim "strategic[ally]" tried to move toward her roommate's room. The man was never more than a step from her and kept his hands on her arms. When they got to the living room, the victim repeatedly attempted to lunge for her roommate's door, but the man pulled her back each time. On her final attempt, she was able to open her roommate's door slightly.

The man then brought the victim to a couch in the living room and leaned her over the couch. The victim's roommate emerged from her room, and the victim yelled for her to call the police. The man saw the roommate and began to leave. As he was walking away, the victim spotted her cell phone in the man's back pocket; although she initially followed the man and told him that he had her phone and demanded that he return it, she quickly returned to her roommate's room, closed the door, and spoke

with a 911 operator until police arrived at the apartment. Because the victim constantly watched the man's face throughout their encounter, she was able to provide a detailed description of her attacker, including that he appeared to be Hispanic and that he was wearing a dark blue hooded sweatshirt ("hoodie") and blue jeans.

That same evening, Athens-Clarke County officers began collecting surveillance footage from the downtown Athens area. The footage captured the movement of both the victim and her attacker, including depicting the victim walking toward her apartment, followed by a person in a blue hoodie and blue jeans approximately 30 seconds later.

Over the course of the next couple of days, the victim and her roommate began repeatedly tracking the victim's phone using the "Find My iPhone" tool. The victim also met with a forensic artist to develop a sketch of her attacker. On October 28, 2019, the victim called 911 several times to report that her phone was pinging near an Athens-area Walmart on Lexington Road. Police responded to the area, having obtained a description of the person potentially in possession of the phone as a Hispanic male with long black hair wearing a red shirt and khaki shorts. A detective spotted a man matching the description, approached him, and asked him if he knew

anything about cell phones being taken in the area. The man admitted he had picked up two cell phones "a couple days earlier." The detective then ran the man's name ("Jose Ramirez") and date of birth through the GCIC/NCIC database, which revealed an active warrant from California for sexual assault. At that time, the detective arrested the man. A search of the man's person following the arrest uncovered two cell phones, including the victim's phone. Shortly thereafter, however, the detective determined that the man he arrested was a different "Jose Ramirez."

In an October 31, 2019 search of Ramirez's mother's vehicle, officers found a dark blue hoodie and blue jeans that matched clothing worn by the suspect as shown in surveillance footage.

An Athens-Clarke County grand jury indicted Ramirez for one count each of criminal attempt to commit a felony (rape), aggravated assault, robbery by force, false imprisonment, and first degree burglary. Ramirez proceeded to trial, which ended in a mistrial due to a hung jury. At Ramirez's second trial, a jury found Ramirez guilty of false imprisonment and first degree burglary and of the lesser included offenses of theft by taking, battery, and simple battery. The trial court denied Ramirez's motion for new trial as amended, and this appeal follows.

5

1. First, Ramirez contends that the trial court erred in denying his motion to suppress, asserting that officers impermissibly arrested and searched him based upon an outstanding California warrant that had been issued against another individual with a similar name. We find no error.

"When considering the denial of a motion to suppress, we view the evidence in favor of the court's ruling, and we review de novo the trial court's application of the law to undisputed facts." (Citation and punctuation omitted.) *Shumate v. State*, 372 Ga. App. 807 (906 SE2d 885) (2024). In his motion to suppress, Ramirez argued that a detective approached him at the Lexington Road Walmart concerning the victim's stolen phone. As part of the encounter, the detective "ran Mr. Ramirez's name and date of birth and found a warrant for a 'Jose Ramirez' . . . in California . . . and that California [sought] extradition." As a result, the detective handcuffed Ramirez and conducted a search, during which the detective found the victim's phone. After Ramirez protested that he did not have an active warrant, the detective ran Ramirez's Social Security number and determined that Ramirez was not the person wanted in California. As a result of the misidentification, Ramirez contended that the detective

did not have reasonable articulable suspicion to detain him or probable cause to arrest or search him.

The trial court conducted a hearing on Ramirez's motion. In its written order denying Ramirez's motion, the trial court made the following findings of fact:

> Athens-Clarke County Police Department Detective . . . Harrison testified that, in the early morning hours of October 26, 2019, an intruder followed [the victim] home from downtown Athens, pushed his way into her residence, attempted to sexually assault her, took her iPhone XR, and then fled. [The victim] provided a description of the individual so that a sketch artist could generate a sketch. Detective Harrison obtained video surveillance from downtown cameras that depicted the individual following [the victim] towards her apartment.

> ACCPD employee . . . McGreevy testified that [the victim] called 911 at 4:58 p.m., as she was remotely tracking her iPhone . . . via an app. She communicated to the 911 call-taker where her iPhone was located and provided location updates as the person carrying the iPhone moved. The State tendered into evidence the CAD report showing the multiple 911 calls [the victim] made that evening. The final location of the iPhone was in front of the Walmart on Lexington Road.

> ACCPD Officer . . . Blackmon testified that on October 28, 2019, while on patrol, he received information from dispatch that a stolen cell phone was pinging in the area of the Walmart on Lexington Road. He also

received a description of a suspect who earlier in the night, had been seen in the area of the pings. It is not clear how the Officer received the description of the suspect, since it is not contained in State's Exhibit 1, which is the Call for Service Detail Report. A video of the officer's encounter with the Defendant was also entered into evidence and viewed by the Court. Officer Blackmon responded to the location and saw the Defendant walking in the Walmart parking lot. Officer Blackmon, in his patrol vehicle, approached the Defendant. He did not engage the emergency flashers or sirens of his vehicle. Nor did Officer Blackmon display any force or indicate to the Defendant that he was not free to leave. He stated that he was not accusing the Defendant of anything, but that the Defendant "kinda matched the description of somebody we're looking for, may have picked up a cell phone by chance." The Defendant replied that he had recently picked up two cell phones from Prince Avenue.

The AXON video (State's Exhibit 3) shows that another officer approaches Officer Blackmon and states that the Defendant "kind of" matches the description of the individual who raped [the victim]. Officer Blackmon then opened an email on his computer that contained the sketch of the suspected rapist. The officer also notes that her cell phone had been pinging in the area the Defendant was traveling.

The Defendant's name and date of birth (3-9-1989) is then called in for a warrant check. A match is mistakenly returned and the Defendant is arrested on the warrant. Sometime later it is discovered that the

Defendant was not the person named in the warrant. A review of the NCIC activity entered as part of State's Exhibit 1 shows that a search was performed for a Jose Ramirez with a date of birth of March 19, 1989 rather than the Defendant's actual date of birth of March 9, 1989. The Defendant is arrested as a result of the officers believing he was the individual named in the warrant. Due to the Defendant's protestations that he was not on probation in California, the officers continued to investigate and ultimately realized he was not the person named in the warrant. Prior to that point he had been searched and two cell phones were seized from him.

Based upon these findings of fact, the trial court concluded that Officer Blackmon initiated a permissible tier one encounter with Ramirez that escalated to a tier two encounter upon Ramirez's admission that he had picked up two cell phones. The trial court further concluded that the officer's entry of an erroneous birthday for Ramirez while searching for active warrants was "undoubtedly negligent," but not "reckless or deliberate," and that "the officers were acting in good faith when they effected Defendant's arrest." Importantly, the trial court added that "the phones would have been inevitably discovered" because "officers would have had sufficient probable

cause to arrest [Ramirez] and would have then found the phone in a search incident to that arrest."[3]

At the outset, we note that

[t]here are at least three types of police-citizen encounters: verbal communications that involve no coercion or detention; brief "stops" or "seizures" that must be accompanied by a reasonable suspicion; and "arrests," which can be supported only by probable cause. A first-tier encounter never intrudes upon any constitutionally protected interest, since the purpose of the Fourth Amendment is not to eliminate all contact between police and citizens, but simply to prevent arbitrary and oppressive police interference with the privacy and personal security of individual citizens. In accordance therewith, during such an encounter, an officer may approach citizens, ask for identification, and freely question the citizen without any basis or belief that the citizen is involved in criminal activity, as long as the officers do not detain the citizen or create the impression that the citizen may not leave. So long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual and no reasonable suspicion is required.

(Citation omitted.) *Ware v. State*, 309 Ga. App. 426, 427 (710 SE2d 627) (2011).

---

[3] The trial court granted Ramirez a certificate of immediate review, but we denied Ramirez's application for interlocutory appeal. See *Ramirez v. State*, A21I0069 (Nov. 5, 2020).

(a) *First-Tier and Second-Tier Encounters*. In this case, the detective's initial approach of, and contact with, Ramirez was a permissible first-tier encounter.

> Even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual, ask to examine the individual's identification, and request consent to search, as long as the police do not convey a message that compliance with their requests is required.

(Citation omitted.) *Ware*, 309 Ga. App. at 427-428. Moreover,

> [i]t is well established that a seizure does not occur simply because a police officer approaches an individual and asks a few questions. Rather, an encounter escalates from a first-tier consensual interaction to a second-tier investigatory detention only when the individual is "seized" by the officer, i.e., only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of the individual.

(Citation omitted.) *State v. Walker*, 350 Ga. App. 168, 174 (2) (a) (828 SE2d 402) (2019).

Similarly, the detective's interaction with Ramirez escalated to a permissible second-tier encounter. See *Walker*, 350 Ga. App. at 174 (2) (a) ("[A] second-tier encounter involves a brief detention of a citizen by police to investigate the possibility

11

that a crime has been or is being committed[.]") (citation omitted). As part of the detective's initial conversation with Ramirez, the detective stated that Ramirez "kind of" looked like someone of interest connected to missing cell phones and asked Ramirez if he had picked up any phones; Ramirez confirmed that he had picked up two cell phones near Prince Avenue in Athens. Ramirez then provided his name and a birth date, which the detective submitted to dispatch to determine whether Ramirez had any active warrants. There is no evidence that the detective coerced or impermissibly detained Ramirez during this encounter.

(b) *Third-Tier Encounter*. Finally, "a third-tier encounter is an arrest and must be supported by probable cause." (Citation omitted.) *Walker*, 350 Ga. App. at 174 (2) (a). Even so, "[s]earches and seizures based on mistakes of fact . . . can be reasonable. . . . The limit is that the mistakes must be those of reasonable men." (Citations and punctuation omitted.) *Perkins v. State*, 360 Ga. App. 782, 784 (1) (b) (861 SE2d 621) (2021). To that end,

> the validity of an arrest is not necessarily dependent upon the existence of a valid arrest warrant because if the person detained is outside of his home and probable cause to arrest exists at the time of detention, a warrant is not required. If, when the arrest is made, the facts and circumstances known to the arresting officer are sufficient to warrant a

12

prudent person in believing that the accused had committed or is committing an offense, the warrantless arrest passes constitutional muster.

*Harvey v. State*, 266 Ga. 671, 672 (469 SE2d 176) (1996).

Here, after the detective learned of the outstanding California warrant, the detective arrested Ramirez; however, the detective learned shortly thereafter that the warrant was actually issued against another person with a similar name and birth date. The transmission the detective received from dispatch, which disclosed an apparent outstanding California arrest warrant against Ramirez, "established the necessary probable cause to arrest [Ramirez]." (Citation and punctuation omitted.) *Harvey*, 266 Ga. at 672. "It is of no consequence that the officer later discovered that the validly issued . . . warrant [was for another, similarly-named person]. The existence of probable cause must be measured by current knowledge, i.e., at the moment the arrest

is made and not hindsight." (Citation and punctuation omitted.) Id. at 672-673.[4] As a result, Ramirez's arrest based upon the outstanding California warrant, was lawful.[5]

Even setting aside the California warrant, probable cause to arrest exists if, when the arrest is made, "the facts within the officer's knowledge at the time of the arrest constituted reasonably trustworthy information which was sufficient to authorize a prudent person to believe that [Ramirez] had committed an offense." *Harvey*, 266 Ga. at 673. In this case, at the moment the detective arrested Ramirez, the detective knew the following: (i) Ramirez resembled the suspect's physical description; (ii) he was wearing the same clothes as a suspect who had been seen earlier at a location where the victim's phone had been tracked; (iii) he was found at

[4] While *Mobley v. State* referred to the analysis in *Harvey* as "strained," the Supreme Court's discomfort seems to be centered upon the fact that *Harvey* involved a bench warrant rather than (as here) an outstanding arrest warrant. 307 Ga. 59, 75 (4) (a), n. 20 (834 SE2d 785) (2019). As the Court in *Mobley* noted, "a bench warrant issued for a failure to appear in court is no ground for believing that the subject of the bench warrant has committed any crime (other than the crime for which he already was arrested and for which he subsequently failed to appear in court)." Id.

[5] Because the arrest was lawful, evidence seized during the ensuing search incident to arrest did not trigger Georgia's exclusionary rule. See OCGA § 17-5-30 (a). Nor do we need to analyze whether the detectives' actions were taken in good faith since OCGA § 17-5-30 was not implicated. But see *Abercrombie v. State*, 343 Ga. App. 774, 790 (2) (b) (808 SE2d 245) (2017) (noting that "there is no good-faith exception [to OCGA § 17-5-30] in Georgia").

14

that location; (iv) he admitted that he recently "picked up" two cell phones when told that police were looking for someone who may have obtained a cell phone; and (v) all of this occurred within two- to-three days of the crimes with which he is charged. These facts, which were independent of the outstanding California arrest warrant, were sufficient to give the detectives probable cause to arrest Ramirez. See, e.g., *Harvey*, 266 Ga. at 673 (noting that, under the Fourth Amendment, the "reasonable belief" needed to establish probable cause for an arrest requires "sufficient probability, not certainty") (punctuation omitted).[6] And because the detectives had probable cause to arrest Ramirez, even without the California warrant, they were authorized to conduct a search incident to that arrest. See *Harvey*, 266 Ga. at 672.

---

[6] The trial court also concluded that the phones in Ramirez's possession "would have been inevitably discovered." An exception to the general principle that a warrantless search is per se unreasonable, the inevitable discovery doctrine "allows the admission of evidence discovered as a result of police error or misconduct if the State can prove by a preponderance of the evidence that such information would have ultimately or inevitably been discovered by lawful means, without any connection to the police error or misconduct." *State v. Colvard*, 296 Ga. 381, 384 (2) n. 6 (768 SE2d 473) (2015). The State has the burden of establishing only a reasonable probability – and only by a preponderance of the evidence – that the inevitable discovery doctrine applies. However, we need not address this exception in view of our analysis in Division 1, supra.

Accordingly, the trial court did not err in denying Ramirez's motion to suppress the cell phones seized following his lawful arrest.

2. Next, Ramirez argues that he received ineffective assistance of trial counsel due to counsel's failure to: (a) file a motion to suppress challenging a search warrant issued for Ramirez's mother's apartment and vehicle; and (b) make appropriate objections during the testimony of two detectives. We are not persuaded.

To demonstrate ineffective assistance of trial counsel, an appellant

must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense. There is a strong presumption that the performance of trial counsel falls within the wide range of reasonable professional assistance. The reasonableness of the conduct is viewed at the time of trial and under the circumstances of the case. In reviewing a lower court's determination of a claim of ineffective assistance of counsel, we give deference to the trial court's factual findings, which are upheld on appeal unless clearly erroneous; however, we review the lower court's legal conclusions de novo.

(Citations omitted.) *Roberts v. State*, 322 Ga. App. 659, 663 (3) (745 SE2d 850) (2013). Importantly,

we evaluate counsel's performance from counsel's perspective at the time of trial. . . . In other words, hindsight has no place in an assessment of the performance of trial counsel, and a lawyer second-guessing his

16

own performance with the benefit of hindsight has no significance for an ineffective assistance of counsel claim.

(Citation and punctuation omitted.) *Williams v. State*, 358 Ga. App. 152, 155 (a) (853 SE2d 383) (2021); see also *Harris v. State*, 304 Ga. 652, 654 (2) (821 SE2d 346) (2018). "If an appellant fails to meet his burden of proving either prong of the *Strickland* [*v. Washington*, 466 U. S. 668 (104 SCt 2052, 80 LE2d 674) (1984)] test, the reviewing court need not examine the other prong." (Citation omitted.) *Roberts*, 322 Ga. App. at 664 (3). "[T]his burden—though not impossible to carry—is a heavy one." (Citation and punctuation omitted.) *Mulkey v. State*, 366 Ga. App. 427, 437 (4) (883 SE2d 173) (2023).

(a) Ramirez first contends that trial counsel rendered ineffective assistance by failing to file a motion to suppress the search warrant for Ramirez's mother's apartment and vehicle. In particular, Ramirez argues that there was no probable cause to search the vehicle because, although the affidavit in support of the warrant indicated that Ramirez stayed at his mother's apartment "in recent days" and would "often times sleep in her vehicle," the affidavit contained no specific allegation that

17

Ramirez "had access to that vehicle in the 48 hours between the incident and his arrest[.]" We are not persuaded.

Georgia law states that

> [w]hen [an] ineffective assistance of counsel claim is based on failure to file a motion [to suppress], the defendant must make a *strong showing* that the evidence would have been suppressed had a motion to suppress been filed. Indeed, counsel's failure to make a motion which will not succeed cannot provide a basis for finding ineffective assistance of counsel.

(Citations and punctuation omitted; emphasis supplied.) *Dent v. State*, 303 Ga. 110, 118 (4) (a) (810 SE2d 527) (2018); see also *Ferguson v. State*, 354 Ga. App. 867, 868 (2) (842 SE2d 77) (2020) (noting that if a defendant fails to make a strong showing that evidence would have been suppressed, "he has failed to establish deficient performance by his trial counsel") (citation and punctuation omitted). In this case, then, "[b]ecause the contested evidence was obtained during the execution of a search warrant, to prevail on a motion to suppress trial counsel would have been required to show that the warrant was not valid." *Ferguson*, 354 Ga. App. at 868 (2). This, Ramirez has not shown.

Ramirez contends that the search warrant for Ramirez's mother's apartment and vehicle "was not supported by probable cause as it related to the search of [the mother's] vehicle" because there was no evidence that Ramirez visited the vehicle in the 48 hours between the crime and his arrest. This contention is without merit.

> [A] search warrant will only issue upon facts "sufficient to show probable cause that a crime is being committed or has been committed." OCGA § 17-5-21 (a). The magistrate's task in determining if probable cause exists to issue a search warrant is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.

(Citation and punctuation omitted.) *State v. Santiago*, 371 Ga. App. 720, 722 (a) (902 SE2d 715) (2024); see also *Lemon v. State*, 279 Ga. 618, 620 (1) (619 SE2d 613) (2005). To that end, "[t]he test for probable cause is not a hypertechnical one to be employed by legal technicians, but is based on the factual and practical considerations of everyday life on which reasonable and prudent people act." (Citation and punctuation omitted.) *Santiago*, 371 Ga. App. at 723 (a).

> A magistrate's decision to issue a search warrant based on a finding of probable cause is entitled to *substantial deference* by a reviewing court. . . .

19

> Moreover, *even doubtful cases should be resolved in favor of upholding a warrant.*

(Citations and punctuation omitted; emphasis supplied.) Id. at 722-723 (a).

Following the October 26 crime and Ramirez's October 28 interview and subsequent arrest, Athens-Clarke County Police Detective Harrison completed a search warrant application on October 31, 2019. During Ramirez's interview, the detective learned that Ramirez was homeless and that his clothes "could be at a relative's home but [Ramirez] would not provide that information." On October 29, two of Ramirez's relatives contacted the detective to inform him that the person seen in surveillance footage, published through media reports, was Ramirez and to provide Ramirez's mother's address. The detective went to Ramirez's mother's apartment, met with Ramirez's mother, and learned that Ramirez had "clothing items inside of the apartment and inside of [her] vehicle." He also learned that Ramirez had "been to the apartment in recent days, *specifically after the* [*r*]*obbery*" and that Ramirez "will often times sleep in her vehicle." (Emphasis supplied.) As a result, the detective averred that he reasonably believed that items of clothing described by the victim, including a "[d]ark blue . . . hooded sweatshirt," were present at Ramirez's mother's

apartment, her vehicle, or both. A magistrate judge signed the warrant on October 31, 2019.

Trial counsel did not move to suppress the evidence taken from Ramirez's mother's vehicle. During Ramirez's motion for new trial hearing, trial counsel testified that it was not "a strategic decision that [he] did not" file a motion to suppress the search warrant, stating instead that he was primarily focused on the police's search of Ramirez at Walmart, which he characterized as a "good issue" that he "spent a lot of time researching . . . and thinking about it and talking about it."

Here, "the affidavit on its face provided the magistrate with enough information to come to the 'practical, common-sense' conclusion that there was a fair probability that evidence of a crime could be found [in Ramirez's mother's vehicle]." *State v. Hunter*, 282 Ga. 278, 279 (646 SE2d 465) (2007) (reversing grant of motion to suppress where officer's warrant application indicated "evidence of criminal activity could be found" at residence where defendant previously lived). Ramirez, who was homeless, indicated that some of his clothing could be found at a relative's house. Two relatives confirmed that Ramirez was the person depicted in media coverage of the crime and directed the detective to Ramirez's mother and her

apartment. Ramirez's mother confirmed that Ramirez had clothing both inside her apartment — which Ramirez had visited during the 48 hours between the crimes and his arrest — and in her vehicle. She added that Ramirez sometimes slept in her vehicle. Based upon these allegations, we conclude that there was sufficient probable cause for the magistrate to authorize a search warrant of Ramirez's mother's apartment and, more specifically, her vehicle.[7]

Stated succinctly, Ramirez has fallen well short of the "strong showing" necessary to demonstrate that the evidence seized from Ramirez's mother's apartment and vehicle "would have been suppressed had a motion to suppress been filed." (Citation and punctuation omitted.) *Dent*, 303 Ga. at 118 (4) (a). "[C]ounsel's failure to make a motion which will not succeed cannot provide a basis for finding ineffective assistance of counsel." Id. Accordingly, Ramirez's claim of ineffective assistance of trial counsel, based upon counsel's failure to move to suppress the search warrant for Ramirez's mother's apartment and vehicle, fails.

---

[7] Even so, Ramirez "has not alleged, other than in conclusory terms, that he was prejudiced by his attorney's failure to attempt to suppress the evidence obtained under the search warrant[.]" (Footnote omitted.) *Dent*, 303 Ga. at 117-118 (4) (a).

(b) Ramirez also asserts that trial counsel rendered ineffective assistance by failing to object to detectives' testimony concerning two aspects of surveillance footage of Ramirez's interaction with the victim. We consider each in turn.

(i) Citing OCGA § 24-7-701 (a), Ramirez first contends that trial counsel erred by failing to object to the detectives' testimony that a hoodie recovered during a search was consistent with the hoodie shown in certain surveillance footage. We do not agree.

Ramirez points to at least eight instances in which Detectives Harrison and Schmidt testified that the hoodie recovered during their search of Ramirez's mother's vehicle was consistent with the hoodie shown in surveillance footage from the downtown Athens area. Two examples are representative of the detectives' testimony:

(1) In referencing images of a tag and writing on a sweatshirt that were captured in a surveillance video, Detective Harrison testified that

> even though you can't see exactly . . . what is on the front of this hoodie, but we know there is something — possibly letters or something — and that is consistent with the hoodie that we seized during the search warrant as well as . . . the tag on that hoodie we see is consistent with what we see in the video from the other camera angle.

23

(2)     Detective Harrison further testified that a "little white spot on . . . the suspect's hoodie that they're wearing, that would be consistent with the tag that we see on this blue hoodie that was seized as evidence."

During the motion for new trial hearing, trial counsel testified that he did not have a strategic reason for not objecting to the detectives' testimony.

OCGA § 24-7-701 (a) provides that

[i]f [a] witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences shall be limited to those opinions or inferences which are:

(1) Rationally based on the perception of the witness;

(2) Helpful to a clear understanding of the witness's testimony or the determination of a fact in issue; *and*

(3) Not based on scientific, technical, or other specialized knowledge within the scope of Code Section 24-7-702.

(Emphasis supplied.) The general purpose of the rule has been described as an attempt "to eliminate the risk that the reliability requirements [for expert witnesses] set forth in Rule 702 will be evaded through the simple expedient of proffering an

expert in lay witness clothing." (Citation and punctuation omitted.) *United States v. Hill*, 643 F3d 807, 841 (V) (A) (11th Cir. 2011) (referencing Federal Rule of Evidence 701). See also *Anglin v. State*, 312 Ga. 503, 514 (3), n. 5 (863 SE2d 148) (2021) ("OCGA § 24-7-701 (a) was modeled on Federal Rule of Evidence 701[.]").

Without specifically saying so, it appears that Ramirez's primary argument is that the detectives' testimony was not "[h]elpful to a clear understanding of the witness's testimony or the determination of a fact in issue[.]" OCGA § 24-7-701 (a) (2). This argument misses the mark. Neither detective's testimony identified Ramirez or offered an opinion that Ramirez was the person depicted in the surveillance footage. See, e.g., *Anderson v. State*, 313 Ga. 178, 184-187 (3) (b) (869 SE2d 401) (2022) (holding that "trial court would not have abused its discretion by determining that the detectives' statements were rationally based on inferences they formed by reviewing the surveillance video and other evidence and by interviewing witnesses and that their testimony about those inferences was helpful to determine who could be seen in the videos and thus who committed the crimes") (citation and punctuation omitted); compare *Dickey v. State*, 313 Ga. 593, 597 (2), n. 2 (872 SE2d 297) (2022); *Cross v. State*, 370 Ga. App. 250, 251-254 (1) (896 SE2d 607) (2023). To the contrary, the

detectives merely testified that the hoodie depicted in surveillance footage was consistent with the hoodie recovered from Ramirez's mother's vehicle. As a result, because the detectives' testimony

> on the surveillance footage was non-opinion, factual testimony about the attire [they] personally observed worn by the individual depicted therein and the attire [they] personally recovered from [defendant's mother's] residence [and vehicle], . . . that testimony is not governed by Rule 701 (a)'s provisions regarding lay opinion testimony.

*Durden v. State*, 318 Ga. 729, 733 (1) (899 SE2d 679) (2024). It therefore follows that "[t]rial counsel was . . . not deficient for failing to make a meritless objection." *Anglin*, 312 Ga. at 514 (3) (holding trial counsel was not ineffective for failing to object to GBI agent's testimony that a grave was "more consistent with being dug by a flat shovel than a rounded one"); see also *Carter v. State*, 310 Ga. 559, 564 (2) (a) (852 SE2d 542) (2020) (finding no ineffective assistance where trial counsel did not object to detective's comparison of a photograph of a shoeprint and defendant's shoes).[8]

_____

[8] *Carter v. State*, 326 Ga. App. 144 (756 SE2d 232) (2014), overruled in part by *Willis v. State*, 304 Ga. 686 (820 SE2d 640) (2018), upon which Ramirez relies, does not apply OCGA § 24-7-701 (a) and is therefore inapposite. See also *Goforth v. State*, 360 Ga. App. 832, 839-840 (2) (861 SE2d 800) (2021) (noting that defendant's argument that "other Georgia case law on [the] issue [of testimony identifying a defendant from surveillance photographs or videos] prior to enactment of the 'new'

(ii) Similarly, relying upon OCGA § 24-6-620, Ramirez argues that trial counsel erroneously failed to object to a detective's testimony that the victim's statement was consistent with surveillance footage of the crime. Again, we disagree.

OCGA § 24-6-620 provides that "[t]he credibility of a witness shall be a matter to be determined by the trier of fact[.]" Ramirez cites four separate instances during Detective Harrison's direct testimony during which, he claims, the detective impermissibly bolstered the victim's credibility:

(1) Q:  And when you said that you were able to corroborate, are you able to see whether or not the suspect in the camera appears to have a mustache?

A:  It does appear that the suspect has a mustache.

(2) Q:  All right. Detective, [the video] we just reviewed, was that consistent or inconsistent with what [the victim] said about her walking home?

A:  That's consistent.

(3) While reviewing surveillance footage of the incident, the detective

Evidence Code . . . must still be applied lacks merit") (punctuation omitted).

27

testified that "[y]ou will see at this point [the victim] and she appears to be helping an intoxicated individual, and she would be with friends, so that's consistent with the statement that she makes."

(4)   Q:    At one point, Detective, do you recall [the victim] talking about her and her friend . . . trying to figure out what to do with this drunk guy?

A:    Yes.

Q:    Is that consistent or inconsistent with what is in the video?

A:    That is consistent with what we see here. That would explain kind of the amount of time while they were standing in that one spot. And then I think the video clearly shows that they are trying to support this individual as they are walking across the street.

Trial counsel again testified that he did not have a strategic reason for not objecting to Detective Harrison's responses. Notably, trial counsel added that, "as I sit here right now and going through these transcripts, I'm surprised I didn't object. . . ."

Our law provides that

[a] witness' credibility may not be bolstered by the opinion of another, even an expert, as to whether the witness is telling the truth. Credibility of a witness is a matter solely within the province of the jury. *It is not*

28

*improper bolstering, however, for a witness to express an opinion as to whether objective evidence in the case is consistent with the victim's story.*

(Citation omitted; emphasis supplied.) *Roberts*, 322 Ga. App. at 665 (3) (d). See also OCGA § 24-6-620; *Mulkey*, 366 Ga. App. at 438 (4) (a) ("when a witness's statement does not directly address the credibility of another witness, there is no improper bolstering") (citation and punctuation omitted); *Blackmon v. State*, 336 Ga. App. 387, 394 (2) (b) (785 SE2d 59) (2016) (physical precedent only) (finding no ineffective assistance of trial counsel due to failure to object to testimony by forensic services director because the director "merely testified that objective evidence in the case was consistent with [victim's] story").

In this case, none of the testimony Ramirez cited directly addressed the victim's credibility and, as a result, the testimony was not bolstering. See *Harris v. State*, 304 Ga. 652, 657 (2) (c) (821 SE2d 346) (2018); *Mulkey*, 366 Ga. App. at 438 (4) (a). Therefore, any objection on that basis would have been meritless, and the "failure to make a meritless objection cannot support a claim of ineffective assistance." (Citation and punctuation omitted). *Harris*, 304 Ga. at 658 (2) (c).

3. Finally, Ramirez contends that the trial court erred during sentencing by interpreting the evidence adduced at trial in a manner inconsistent with the jury's verdict. More plainly, Ramirez asserts the trial court's sentence was overly harsh in view of his acquittal of certain crimes. We find no error.

After a lengthy argument from Ramirez's trial counsel during sentencing, the trial court stated

> these are very serious charges. I mean . . . I can't forget what you did. You followed this young lady home at night. You went into her apartment. You grabbed her. You stole her cell phone. You held her against your will — her will, rather. And I shudder to think what might have happened if the roommate hadn't been there, and I know you didn't anticipate that there'd be anybody else there and if she hadn't come out and sort of — at that point that's when you realized you had to leave, then I don't know what would have happened. So I don't think we can minimize what you did.

The trial court ultimately sentenced Ramirez to 12 months for battery, 12 months for theft by taking, 10 years for false imprisonment, and 20 years for first degree burglary.[9]

Our law provides that

---

[9] The trial court ordered that each sentence would be served in confinement and would be served concurrently.

[w]hen sentencing, a trial court may consider any evidence that was properly admitted during the guilt-innocence phase of the trial[.] . . . A trial court should not, however, take into account when sentencing any considerations that are not clearly shown by the evidence of record.

*Blake v. State*, 273 Ga. 447, 450 (4) (542 SE2d 492) (2001). See also *Ellicott v. State*, 320 Ga. App. 729, 735 (4) (740 SE2d 716) (2013) (same). In this case, the trial court's remarks largely focused on the evidence adduced at trial. But even if the trial court strayed from the evidence in some slight manner, Ramirez has failed to demonstrate prejudice resulting from the remarks "because his sentences were well within applicable statutory limits." *Ellicott*, 320 Ga. App. at 735-736 (4) (concluding that trial court's statements during sentencing were not prejudicial where trial judge compared defendant's conviction to the "death of a monster," suggested that defendant "should have committed suicide[,]" and that the sentence "would ensure that [defendant] would spend his life confined to a small cell where he would spend every day thinking about the freedom that he once had") (punctuation omitted). See also OCGA § 16-7-1 (b) ("A person who commits the offense of burglary in the first degree

shall be guilty of a felony and, upon conviction thereof, shall be punished by imprisonment for not less than one nor more than 20 years.").[10]

In sum, we conclude that the trial court did not err in denying Ramirez's motion for new trial as amended.

*Judgment affirmed. Doyle, P. J., and Watkins, J., concur.*

---

[10] Ramirez's remaining sentences were likewise within their statutory limits. See OCGA §§ 16-5-23.1 (c) ("a person who commits the offense of battery is guilty of a misdemeanor"), 16-5-41 (b) ("A person convicted of the offense of false imprisonment shall be punished by imprisonment for not less than one nor more than ten years."), 16-8-2 (defining crime of theft by taking), 16-8-12 (a) ("A person convicted of a violation of [OCGA § 16-8-2] shall be punished as for a misdemeanor . . . ."); see also OCGA § 17-10-3 (a) ("Except as otherwise provided by law, every crime declared to be a misdemeanor shall be punished as follows:
(1) By a fine not to exceed $1,000.00 or by confinement in the county or other jail, county correctional institution, or such other places as counties may provide for maintenance of county inmates, for a total term not to exceed 12 months, or both[.]").